<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

</div>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| TENET HEALTHCARE CORPORATION, | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION NO. 3:11-cv-00732-M** |
| | : | |
| v. | : | |
| | : | |
| COMMUNITY HEALTH SYSTEMS, INC., | : | **AMENDED COMPLAINT FOR** |
| WAYNE T. SMITH, and W. LARRY CASH, | : | **VIOLATIONS OF FEDERAL** |
| | : | **SECURITIES LAWS** |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<div align="center">

**AMENDED COMPLAINT**

</div>

Plaintiff Tenet Healthcare Corporation ("Tenet"), by and through its undersigned attorneys, alleges as follows:

<div align="center">

**SUMMARY AND NATURE OF THE ACTION**

</div>

1.     This action seeks to recover from Defendants Community Health Systems, Inc. ("CHS"), Wayne T. Smith (CHS's CEO) and W. Larry Cash (CHS's CFO) the substantial sums of money that Tenet was forced to expend, during CHS's recently discontinued proxy fight for control of Tenet's Board of Directors, in order to analyze and confirm highly troubling facts about CHS's business practices that were brought to Tenet's attention.  These facts were not disclosed by Defendants, and therefore made their proxy statements to Tenet's shareholders materially false and misleading.  Through Tenet's extensive analysis, which never would have been necessary had CHS made full and accurate disclosure about its business practices, Tenet has discovered, as alleged herein, CHS's practice of systematically admitting, rather than observing, patients in CHS hospitals for financial rather than clinical reasons.  CHS has driven

**PLAINTIFF'S AMENDED COMPLAINT - Page 1**

up patient admission rates at its hospitals by employing a number of improper strategies, such as using a home-grown and non-standard set of admission justifications known as the "Blue Book," utilizing the "Pro-MED" tool in the Emergency Department ("ED") to increase admissions and to keep discharge-ready patients from being discharged, and implementing a number of incentive and enforcement mechanisms to keep CHS personnel (including CHS-affiliated physicians) in line with CHS's admission-at-all-cost corporate policy.  These strategies, among others, have enabled CHS to overuse the "inpatient admission" status, which generates more revenue for CHS—often substantially more—than if the patient were placed in observation status or discharged.  As a result, Defendants have for many years overstated CHS's growth statistics, revenues, and profits, which has created a substantial undisclosed financial and legal liability to the federal government, numerous state governments, private insurance companies, and patients.

2.      These statements arose in the context of CHS's attempt to take over Tenet through a strategy of replacing Tenet's current Board of Directors with a slate of directors selected by CHS itself.  Specifically, as CHS attempted to acquire Tenet for $6.00 per share—an offer that CHS converted from a cash-and-stock to all-cash offer one week after Tenet filed its original Complaint in this action for the purpose, according to CHS, of avoiding this litigation altogether—and then for $7.25 per share, Defendants made materially false and misleading statements to Tenet's shareholders in the hope that they would exert pressure on Tenet to accept CHS's inadequate offers and would elect directors nominated by CHS as part of its strategy of taking over Tenet.  Beginning in late 2010, for example, CHS stated that a combined CHS-Tenet would benefit patients by "improv[ing the] quality of care" and benefit payers and employers by providing "cost-efficient" healthcare services.  CHS claimed, moreover, that there was "significant synergy potential" in its proposed acquisition of Tenet, similar to the synergies CHS

claims to have achieved through its acquisition of other hospitals.  CHS also called itself an

"Industry Leader in Admissions Growth."

3.      But what CHS failed to disclose—and what made CHS's proxy solicitation

materials[1] and other public statements materially misleading—were critical facts in connection

with both CHS's core business practices and the scrutiny that various government agencies and

concerned CHS shareholders cast upon those very practices.  As set forth in this Amended

Complaint, Defendants exhibited a pattern of both misrepresenting and failing to disclose the

following material facts, among other things:

- CHS has for over a decade been using a unique, non-industry standard set of admissions criteria;

- These home-grown admissions criteria, known as the "Blue Book," along with Pro-MED and CHS's incentive and enforcement mechanisms, have caused CHS hospitals to systematically admit patients to the hospital whose medical condition did not require inpatient treatment, allowing CHS to "achieve" much higher admission rates than it would have had it admitted patients according to medical need, as required under Medicare rules and regulations;

- CHS has failed to accurately describe its admissions "gains" from its acquired hospitals—including how the number of one-day inpatient stays rose dramatically at CHS's acquired hospitals, and in particular, at Triad;

---

[1] As set forth herein, the proxy solicitation materials at issue in this Amended Complaint are CHS's SEC filings containing CHS's public statements made in support of its solicitation of proxies for the election of directors at Tenet's next annual meeting.

**PLAINTIFF'S AMENDED COMPLAINT - Page 3**

- Only after Tenet filed its complaint did CHS reveal that it was the subject of government investigations at the time of the original complaint and that CHS received a regulatory subpoena relating to the very issues raised by Tenet in this action, including an investigation by the U.S. Department of Health and Human Services, Office of the Inspector General (the "OIG"), and various US Attorneys' offices;

- Only after Tenet filed its complaint did CHS reveal that *over six months ago* it received a letter from a shareholder group identifying the same improper admission practices at CHS hospitals alleged by Tenet in this action; and

- CHS, again, has only recently revealed that these same allegations of improper admission practices have been raised in *qui tam* actions filed against CHS and/or its subsidiaries.  A copy of a *qui tam* action filed against a CHS subsidiary in July 2009, and unsealed on December 27, 2010, is attached hereto as Exhibit A.

4.     With respect to its core business practices, CHS failed to disclosed how it has managed to realize "synergies" from its hospital acquisitions:  for at least a decade, CHS has implemented admissions criteria utilized by CHS physicians and employed other admission-centric tactics to systematically steer patients who visit the emergency departments in CHS hospitals into medically unnecessary inpatient admissions.  CHS artificially increases inpatient admissions for the purpose of receiving substantially higher and unwarranted payments from Medicare and other sources.  This admissions practice is the core "synergy" and driver of CHS's strategy for acquiring hospitals.  Specifically, CHS has managed to improve the financial performance of its acquired hospitals not by growing the business, but by changing the acquired

hospitals' admissions criteria, so as to move would-be observed patients into admitted status, generating substantial incremental revenue for CHS.[2]

5.      To take just one example of CHS's material omissions, CHS trumpeted the synergies that it created through its 2007 acquisition of Triad Hospitals, Inc. ("Triad").  What CHS did not disclose, however, is that it achieved these synergies by slashing the use of observation at the former Triad hospitals by more than 50% in one year, shifting these would-be observed patients to inpatient admitted status to generate substantial revenue for the hospital. Unsurprisingly, Triad's percentage of "one-day stay" admissions, which Medicare auditors consider to be potentially indicative of improper admissions, jumped nearly 33% in the year following the CHS acquisition, with even higher increases for patients with common conditions such as chest pain, syncope, and GI-bleed.

6.      CHS's undisclosed practice of systematically admitting, rather than observing, patients who present at CHS hospitals violates both Medicare rules and widely accepted standards of clinical care.  It also subjects federal and state healthcare programs, insurance companies, local employers, and patients to excessive costs for needless hospital stays.

------

[2] Lest there be any doubt as to the materiality of CHS's admission and observation practices, CHS's potential liability from these abnormal practices, and CHS's financial statements generally to Tenet shareholders' decision whether to elect the CHS-nominated slate of directors, on April 28, 2011, CHS filed with the SEC a presentation delivered during an investor teleconference entitled "CHS Response Presentation."  The 109-page presentation described, for example, CHS's business practices, certain tools through which CHS is alleged to have driven improper admissions (the Blue Book and Pro-Med), CHS's compliance program, and CHS's annual revenue.  CHS filed this presentation, along with a transcript of the teleconference hosted by Defendants Smith and Cash, with the SEC as proxy solicitation materials pursuant to Section 14(a) of the Securities Exchange Act of 1934.  In other words, CHS has acknowledged through these SEC filings that each of the topics identified during the presentation was material to Tenet's shareholders in connection with the proxy solicitation process.

7.      These improper and undisclosed admissions practices, which set CHS apart from other peer hospital groups in the country, allowed CHS to receive hundreds of millions of dollars between 2003 and 2009 by treating Medicare patients on an admitted inpatient basis who should have been treated in observation.  As a result, CHS has been paid by Medicare, and likely state Medicaid programs, private insurance companies, and other payers,[3] many hundreds of millions of dollars for unnecessary hospital admissions.  CHS may well be subject to liability and damages of well over $1 billion for its practices during the 2003-2009 period, not to mention damages to other payers and to the tens of thousands of patients who should never have been admitted as inpatients in CHS hospitals.[4]  CHS may even be subject to exclusion from participating in Medicare altogether, which could threaten the viability of the company entirely.

---

[3]  The information set forth in this Amended Complaint is based on public information relating to Medicare patients alone.  There is no public information available on payments by other payers, but there is every reason to believe that patients covered by other payers also are subject to CHS's improper admissions practices.

[4]  The analyses set forth in this amended complaint were prepared by Avalere Health LLC ("Avalere"), a leading healthcare advisory firm.  As set forth herein, the calculations conducted by Avalere in support of this Amended Complaint were, in some cases, revised from the calculations set forth in the original complaint to exclude pre-acquisition data and post-divestiture data for certain CHS hospitals, as well as certain CHS hospitals that, upon further review, did not meet Avalere's criteria for inclusion in its analysis.  Avalere estimated the number of patients between 2003 and 2009 who were admitted at CHS hospitals but would have been placed in observation status if CHS had utilized observation status at the same rate as the industry average and of another hospital operator, LifePoint, and estimated the revenue generated by CHS as a result of admitting these patients.  In particular, Avalere estimates that, from 2006-2009, between approximately 51,000 and 65,000 patients were admitted to a CHS hospital that would not have been admitted if CHS observed patients at the national average or the observation rate of LifePoint.  Avalere also estimates that CHS received between approximately $232 million and $306 million as a result of admitting these patients to the hospital.  And, for the 2003-2009 period, Avalere estimates that between approximately 60,000 and 74,000 patients were admitted to a CHS hospital that would not have been admitted if CHS observed patients at the national average or the observation rate of LifePoint.  Avalere also estimates that CHS received between approximately $271 million and $345 million as a result of admitting these patients to the hospital.  Because the United

[Footnote continued on next page]

8.      Not only have Defendants failed to disclose core facts about CHS's business practices and strategy, but, in the aftermath of Tenet's original Complaint, Defendants' disclosure failures became even more pronounced.  In just the last month, CHS revealed for the first time that the improper admissions practices highlighted in Tenet's original Complaint had long been under scrutiny.

9.      First, after the market closed on Friday, April 15, 2011—and after a full business week of investors and investment analysts speculating about whether the federal government would launch an investigation into CHS's admissions practices—CHS disclosed that it already was under investigation for many of these same improper practices at the time Tenet filed its original Complaint.  Specifically, CHS disclosed that it had received a subpoena, dated March 31, 2011, from the OIG, "in connection with an investigation of possible improper claims submitted to Medicare and Medicaid."  In other words, during the entire five-business-day period when CHS was having numerous communications and conversations with investors and analysts about the action Tenet commenced, CHS covered up the unquestionably material fact that its primary federal regulator was already investigating CHS for Medicare fraud relating to these very issues.

---

[Footnote continued from previous page]
States Department of Justice may impose treble damages for false Medicare claims, and the federal False Claims Act imposes a penalty of up to $11,000 per claim for improperly billed claims, CHS may face well over $1 billion in undisclosed liabilities—and this is only for Medicare Fee-for-Service patients, which made up approximately 27% of CHS's net operating revenue in 2010.  These liabilities do not include CHS's potential liability to other payers who may have been harmed by CHS's admissions practices, including insurance companies, state Medicaid programs, employers, and patients.

10.    Then, on April 18, 2011—one week after Tenet filed its original Complaint—CHS announced that, *over six months earlier*, it had received a letter from a shareholder group alerting CHS and its management, among other things, that:

- CHS's "billing of the Medicare program" was "aggressive and unsustainable";

- "CHS has instituted a corporate policy that appears to have resulted in the admission of many patients who may not have required inpatient care, and which has led to many ED visitors being admitted to inpatient stays that ultimately lasted only one day";

- "Short stays are viewed as potential indicators of cases of inappropriate patient status assignment that result in higher reimbursement than observation stays"; and

- CHS earned, in 2008 alone, $60 million, or nearly 30% of its net income for that year, from billing Medicare for "one-day stays" and through higher than expected ED admissions.

11.    Late in the afternoon on April 22, 2011, CHS announced that it "was contacted by the U.S. Department of Justice ("DOJ") regarding a complaint styled *United States ex rel. and Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*, filed in the Northern District of Indiana, Fort Wayne Division."  Originally filed under seal on January 7, 2009 and unsealed on December 27, 2010, the *qui tam* suit alleges, under oath, that prior to the Triad acquisition, Lutheran Hospital of Indiana ("Lutheran"), then a Triad hospital, was proactively auditing its inpatient short stays and was writing off Medicare reimbursements averaging $50,000 or more per month for admissions that should have been observations.  The suit further alleges that after

CHS acquired Triad, CHS "abruptly" halted these reimbursements because they constituted "a monetary loss CHS would not permit," and proceeded to impose "questionable medical criteria [CHS] devised and [is] different than that established by Medicare, *i.e.* Blue Book v. InterQual criteria." In its court filing dated April 22, 2011, the DOJ informed the court that, "[a]s a result of the ongoing investigation of CHS and related entities and the *Tenet* lawsuit, the United States is reconsidering its decision about intervening in [the *qui tam* action]."

12.     Then, on April 25, 2011, CHS disclosed that the DOJ had, in light of allegations raised in "other qui tam complaints in other jurisdictions," consolidated its investigation of CHS and was "closely coordinating" its efforts with the Civil Division of the DOJ, several US Attorneys' offices, the OIG, and the Attorney General of Texas and other States, and that the Office of Audit Services for OIG would conduct a national audit of CHS's Medicare claims.

13.     Tenet, therefore, brings this Amended Complaint to recover the significant costs it incurred in conducting a thorough analysis of CHS' improper admission practices and its false and misleading proxy solicitation statements. But for these material misstatements from CHS during its proxy solicitation efforts to persuade Tenet shareholders to endorse its bid for Tenet by voting for its proposed director slate, Tenet never would have been forced to expend considerable sums investigating CHS and uncovering troubling facts about CHS's business that are the subject of numerous previously undisclosed regulatory investigations.

* * * * *

14.     This litigation addresses core principles of patient care that CHS—and CHS alone among its peers in the industry—has fundamentally ignored in order to improve its own bottom line. CHS has placed profits before patients, and in so doing has placed its future in peril. In particular, at the center of this litigation is an issue that hospitals and medical staff deal with

every day:  how a patient is appropriately treated at a hospital, and to the extent that patient is

covered by Medicare, how that treatment should be billed to Medicare.

15.     When a patient visits a hospital's emergency department or is otherwise referred

to the hospital, physicians must determine, based on the severity of the patient's condition and

expected treatment, whether the patient should be:  i) admitted to the hospital for inpatient

treatment; ii) observed in an observation bed for a period typically lasting up to 24 hours, but

rarely more than 48 hours, before a decision can be made whether the patient requires hospital

admission or may be discharged; or iii) provided treatment for minor conditions on an outpatient

basis and then immediately discharged.  The decision of whether to admit a patient or treat the

patient in observation status has significant financial ramifications for the hospital.[5]

Specifically, hospitals are paid substantially more by the Medicare program and certain other

payers to treat a patient who has been billed as an admitted inpatient rather than one who has

been billed in observation status.  According to the Medicare Payment Advisory Commission

(MedPAC), the independent Congressional agency that advises the U.S. Congress on issues

affecting the Medicare program, for some patients, the Medicare program reimburses hospitals

nearly $7,000 more per patient when the patient is admitted to the hospital as compared to

treatment for the same patient in observation status.

16.     Under federal law, Medicare reimburses hospitals only for treatment that is

"reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. §

1395y(a)(1)(A).  In addition, Medicare Administrative Contractors who process Medicare

payments are prohibited from using Medicare funds to pay for services if those services were not

---

[5]  As set forth in this Amended Complaint, the analyses conducted by independent consultants
took all patients treated in a hospital bed, and measured which portion were billed as
"observation" and which portion were billed as "admissions."

"medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary."  Medicare Program Integrity Manual, Chapter 6, Section 6.5.2.  Similarly, under the Medicare Program Integrity Manual, "[i]npatient care, rather than outpatient care, is required only if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting."  *Id.*

17.     Despite these Medicare provisions, CHS has developed admissions criteria that systematically steer patients into medically unnecessary inpatient admissions when those patients should be safely and effectively treated as outpatients in observation status.  CHS accomplished this increase in patient admissions by, among other strategies to be described in this Amended Complaint, implementing, in or around 2000, a home-grown set of patient admission criteria called the Blue Book, which was copyrighted in 2000 and is publicly available at the United States Copyright Office.  The purpose of the Blue Book is simple: to provide a mechanism for CHS management to justify to its medical staff criteria for the admission of patients who otherwise could have been observed and released.[6]

18.     Approximately three-quarters of hospitals in the country, including many publicly-traded hospital operators other than CHS, as well as nearly all major insurance companies, other payers and Medicare auditors, utilize one of two sets of independent, evidence-based, clinical criteria to determine whether a patient requires inpatient treatment or, instead, can be treated in outpatient observation status and/or discharged shortly after initial treatment at the hospital:  i) the InterQual Criteria, developed by McKesson Corporation, which are used by

---

[6] The version of the Blue Book discussed in this complaint was put in place at CHS hospitals during 2009.  On information and belief, the previous versions of the Blue Book contained Admissions Justification criteria that were substantially similar to—if not more pro-admission than—the 2009 version of the Blue Book.

approximately 60% of hospitals, and ii) the Milliman Care Guidelines, developed by Milliman, Inc., which are used by roughly 16% of hospitals.  The Blue Book, on the other hand, is used only by CHS hospitals.

19.    Rather than utilize the industry standard, objective criteria, however, CHS developed what in 2009 was a 40-page Blue Book, which was internally generated by CHS and lacks a single reference to a medical journal or other source.  By way of comparison, the InterQual Criteria were developed by an independent panel of 1,100 physicians and medical providers, contain over 16,000 references to medical sources, and are used by 3,700 hospitals across the country.  Development of the Milliman Care Guidelines, which have more than 15,000 medical references and are used by over 1,000 hospitals, was overseen by an experienced team of physicians and reviewed by approximately 100 independent doctors.

20.    Since they are designed to maximize inpatient admissions, the Blue Book criteria are not even "guidelines," but are a series of what the Blue Book calls "Admission Justification[s]" that are far more subjective and liberal than the evidence-based clinical criteria used by virtually all major hospital operators in the country.  For many common patient conditions, such as chest pain, syncope, pneumonia, gastrointestinal bleeding, and atrial fibrillation, the Blue Book sets forth far less rigorous (and clinically inappropriate) criteria for admitting a patient to the hospital than the industry standard criteria.  Indeed, in many cases the Blue Book contains admissions criteria for which there is no clinical basis to admit the patient.

21.    For example, under the Blue Book Admissions Justifications, a chest pain patient with nothing more than hypertension, and either shortness of breath, fatigue, sleeplessness and/or anxiety may be admitted to the telemetry unit of a CHS hospital.  The Blue Book also justifies admission of a chest pain patient to the cardiac care unit ("CCU")—which is reserved for

patients with the most critical medical conditions who require intensive and rapid treatment for survival—based on criteria that have no bearing on the severity of the patient's existing illness, but rather, address only the patient's medical history or conditions that are common among many chest pain patients.  The InterQual Criteria, on the other hand, reject these liberal Blue Book Admission Justifications as a basis for admitting a patient to the hospital.

22.     For another example, a patient with an irregular heartbeat, which may be caused by atrial fibrillation, may be admitted to the hospital under the Blue Book merely when the patient has high or low potassium levels (common conditions easily treated at home or in observation) or when an X-ray shows increased heart silhouette, which typically results from a faulty X-ray and, in any event, has no bearing on the severity of a patient's atrial fibrillation. These symptoms and findings would not, under InterQual Criteria, warrant admitting a patient to the hospital.

23.     The Blue Book also justifies the admission to CHS hospitals of patients suffering from pneumonia even though the patient has nothing more than a cough and "rales" (fluid in the lungs), which exist for every patient with pneumonia.  Again, the existence of a cough and rales in a patient gives no indication, standing alone, that it is medically necessary to admit that pneumonia patient to the hospital, rather than treating the patient in observation through IV antibiotics.  And once again, a patient with a cough and rales would not, under the InterQual Criteria, be admitted to the hospital.

24.     In these and other examples, the Blue Book Admission Justification criteria are at odds with standard clinical decision-making across the industry.

25.     The purpose of CHS's liberal Blue Book criteria and admissions practices is clear: by admitting patients who, under accepted clinical criteria utilized throughout the hospital

industry, should have been treated in observation or sent home, CHS receives substantially more money from Medicare than if the patient had been treated in outpatient observation status—an average of over $3,500 in 2009—more per patient for CHS's highest volume and lowest acuity admitted patients.  The financial impact is much higher for patients with less common conditions who are improperly admitted to a CHS hospital.  As a result, taxpayers, insurers, businesses, and individuals have paid CHS hospitals more than they should for medical treatment.

26.     According to an analysis of publicly available information on hospital observation rates, CHS's effort to increase its revenue by driving up its admissions rate (with a corresponding decreased use of observation status) through the application of the Blue Book criteria has been very effective.[7]  The analysis also shows that CHS's admission practices are unique in the hospital industry, as CHS's observation rate[8] is substantially lower than that of other publicly traded hospital systems, well-known non-publicly traded hospital systems, and the hospital industry as a whole.

---

[7] Following CHS's original proposal to acquire Tenet, Tenet undertook an effort to understand more fully CHS's business practices and financial results.  In particular, Tenet turned to two leading consulting firms, including Avalere, to study, based on publicly available data, how CHS's observation rate and related statistics compared to a number of publicly traded hospital systems, well-known non-publicly traded hospital systems, and the hospital industry as a whole.  These consulting firms relied on separate data sources.  One used data in the American Hospital Directory, while Avalere used the Centers for Medicare & Medicaid Services' ("CMS") Outpatient Standard Analytic Files ("SAFs") and Inpatient Prospective Payment System SAFs, which contains source data from which the Medicare Provider Analysis and Review ("MedPAR") database is constructed.  Using these separate data sources, these consultants reached substantially similar conclusions.  The observation data and admission data set forth in this Amended Complaint were compiled through Avalere's analysis, which, again, used only publicly available data.

[8] Observation rate is the number of Medicare outpatient observation claims divided by the sum of Medicare outpatient observation claims plus Medicare inpatient claims.  For a description of this methodology, see "Variation in the use of observation status evaluation in Massachusetts acute care hospitals, 2003–2006," International Journal of Internal Medicine, 2010 December; 3(4): 367–372, *available at* www.ncbi.nlm.bih.pmc/articles/PMC3047847/.

27.     Based on an analysis of Medicare claims data, the observation rate at CHS—the number of patients who are treated on an observation basis as a percentage of patients either admitted or observed—is approximately 60% less than the national average, and substantially below other publicly traded hospital systems and well-known non-publicly traded hospital systems.  This means that a patient is far more likely to be treated in the higher-paying inpatient admission status, and far less likely to be treated in lower-paying observation status, if the patient visits a CHS hospital than if the patient visited a hospital operated by CHS's peers.  The Medicare claims data also show that CHS's low observation rate is explained not by CHS treating its hospitals' ED patients on an outpatient basis (*i.e.*, without observation) and sending them home, but by CHS *admitting* patients to the hospital who should have been placed in observation status.

28.     CHS's anomalous observation rate is not driven by a small number of CHS hospitals.  Rather, 95% of CHS's short-term acute care hospitals have observation rates below the national average.  And, as shown in detail below, CHS's low observation rate cannot be explained by the type of patients visiting CHS hospitals, by geographic considerations or by isolating specific types of hospital.  In fact, when taking these factors into consideration, CHS actually should have an observation rate well in excess of the national average, rather than less than half the national average, but the observation data shows that exactly the opposite is true. Importantly, whether comparing CHS to the nation generally, to its peer companies, to its geographically nearby competitors, or to the nation by facility type, CHS's observation rate is substantially below average.  The reason is clear:  CHS *admits*, rather than treating on an outpatient basis and sending home, patients who at other facilities would be treated in observation status.

29.     Because CHS is admitting significant numbers of patients who should be treated in observation, it is not surprising that the percentage of CHS's admitted patients who stay in the hospital a single day is higher than the industry average.  Most telling, however, is the spike in one-day stays at CHS's hospitals acquired over the past several years—and in particular the Triad hospitals—in the year following their acquisition by CHS.  At Triad, for example, the percentage of all admissions that were one-day stays jumped nearly 33% in just one year following CHS's acquisition of Triad—yet another clear sign that, under CHS, Triad's hospitals were inappropriately admitting patients who should have been treated in observation status.

30.     The statistical analysis and evaluation of CHS's business practices lead to a single, inescapable conclusion:  patients whose medical needs likely required treatment in outpatient observation status were systematically admitted for higher-paying inpatient treatment at CHS hospitals.

31.     CHS has reaped enormous sums through its admissions practices.  Avalere estimated of the amount of revenue that CHS earned as a result of admitting patients who would have been observed if CHS observed patients at the national average or at the rate of LifePoint. Since the filing of the original complaint, Avalere revised its analysis to exclude pre-acquisition data and post-divestiture data for certain CHS hospitals, as well as to exclude certain CHS hospitals that, upon further review, did not qualify as eligible under Avalere's study criteria. Under this analysis, Avalere estimates that CHS received between approximately $232 million and $306 million as a result of these admissions from 2006-2009 and between approximately $271 million and $345 million as a result of these admissions from 2003-2009.  As a result of CHS's admission practices with respect to these Medicare patients, CHS likely will be subject to significant damages.  Under the federal False Claims Act, CHS may be liable to the government

for up to treble damages and a penalty of up to $11,000 per claim for false claims submitted to federal healthcare programs, meaning that CHS has potential exposure of well over $1 billion.

32.     Critically, given that CHS's practices likely also impacted private insurance companies, state Medicaid programs, and other payers, not to mention the tens of thousands of patients who were unnecessarily admitted into a CHS hospital, CHS's improper revenue received from admitting Medicare patients may be just a fraction of the overall improper revenue received by CHS as a result of its admissions practices.  To put CHS's potential liability to non-Medicare payers in perspective, in 2010, CHS earned approximately 27% of its net operating revenue from Medicare Fee-for-Service payments, or $3.4 billion.  And, moreover, these potential damages do not reflect the risk that CHS, based on its wide-ranging improper billing practices, may be excluded from participating in Medicare altogether.

33.     In its effort to take control of Tenet, CHS made numerous statements to Tenet shareholders in CHS's proxy solicitation materials that were false and/or misleading in light of CHS's failure to disclose its admissions practices.  One prominent example was CHS's claims of success in realizing synergies from the acquisition of Triad in 2007, which CHS stated would be repeated through a Tenet acquisition.  CHS failed to disclose, however, that a potentially material portion of these supposed synergies with Triad were realized through CHS's systematic reduction in the observation rate at the former Triad hospitals—a stunning 52% drop in the calendar year following the acquisition.  The Medicare data demonstrates unmistakably that, after the CHS acquisition, the patients who most likely would have been observed at a Triad hospital pre-acquisition were *not* simply treated in ED and sent home.  Rather, the Medicare data shows that virtually all of these patients likely were *admitted* to the hospital, resulting in substantial revenue for CHS and driving up Triad's one-day stay numbers substantially in one

year after the acquisition.  Thus, CHS's oft-stated success in boosting profits through the Triad

acquisition now appears to have resulted not simply from eliminating redundant overhead, but

from improperly admitting patients who, under standard clinical practice, should have been

treated in observation.[9]

* * * * *

34.      In light of CHS's original acquisition proposal, beginning in November 2010,

Tenet engaged in extensive analyses to assess the potential sources of operating "synergies," if

any, that could result from combining CHS and Tenet, since such synergies would have a direct

bearing on the value of Tenet to CHS.  Tenet and its advisors found CHS's claims of synergies,

as described on its December 10, 2010 investor call, difficult to substantiate.  Indeed, of the sort

of synergies described on that call—increased negotiating power with managed care

companies—Tenet could only find one small market in which it believed this synergy might

exist.  Tenet was then informed by a third party that CHS applied overly-aggressive criteria to

justify admitting patients to the hospital rather than having them observed and discharged, which

created numerous disputes with payers.  This information was consistent with CHS's recent

statements on earnings calls that it had reclassified patients who had been admitted to the

hospital for "one-day stays" to observation status.  In order to more fully understand this issue,

---

[9] Defendants have misled investors and analysts about its Triad "success" for years.  For
example, during CHS's Q1 2008 Earnings Call, Defendant Cash attributed CHS's same store
admissions growth of 3.8% versus the 0.4% industry average that quarter to the volume of flu
cases and the fact that there was an additional day in February that year:  "Flu related
admissions represented approximately 120 basis points of increase and an additional day in
February represented approximately 120 basis points."  However, neither of these factors is
specific to CHS.  The leap year factor is obviously universally applicable and, given CHS's
diverse operating environments (with hospitals in 28 states), it is highly unlikely that CHS
saw significantly more flu cases than the national average.  CHS's same store admissions
growth during the first quarter 2008 resulted in large part from CHS's improper increase in
inpatient admissions at its newly acquired Triad hospitals.

**PLAINTIFF'S AMENDED COMPLAINT - Page 18**

Tenet and its consultants performed the analyses discussed herein, using publicly available data for Medicare claims, of CHS's use of observation status.

35.     On May 9, 2011, CHS withdrew its offer to acquire Tenet and its slate of directors whom CHS had nominated to replace the incumbent Tenet Board of Directors.  Tenet now files this Amended Complaint to recover its substantial costs incurred in analyzing CHS's violations of the federal securities laws by making materially false and misleading statements in connection with its proxy solicitation.

## JURISDICTION AND VENUE

36.     This Court has subject matter over this action pursuant to 15 U.S.C. §§ 78aa, 78m(d)(3), 78n(a), 28 U.S.C. § 1331.

37.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391.

38.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding the propriety of Defendants' statements and disclosures under Section 14(a) of the Exchange Act, and SEC Rule 14a-9.

## PARTIES

39.     Plaintiff Tenet is a corporation incorporated under the laws of Nevada with its principal place of business at 1445 Ross Avenue, Dallas, Texas 75202.  Tenet is a health care services company whose subsidiaries and affiliates operate general hospitals and related health care facilities, including 49 general hospitals and one critical access hospital in 11 states.  Tenet employs approximately 57,500 personnel, including nearly 10,000 in Texas, and nearly 3,000 in the Dallas / Ft. Worth area.

40.     Defendant CHS is a corporation incorporated under the laws of Delaware with its principal place of business at 4000 Meridian Boulevard, Franklin, Tennessee 37067.  CHS provides healthcare services through 130 hospitals that it owns or leases in 29 states.

41.     Defendant Wayne T. Smith is the Chairman and Chief Executive Officer of CHS, a position he has held since 1997.

42.     Defendant W. Larry Cash is a member of the CHS Board of Directors and serves as the Chief Financial Officer of CHS, a position he has held since 1997.

## CHS'S POLICY OF DRIVING ADMISSIONS GROWTH AND OVERBILLING MEDICARE

43.     At the heart of the false and misleading statements in CHS's proxy solicitation materials is CHS's eschewal of certain fundamental principles of medical care:  to treat patients according to their clinical needs, not the hospital's bottom line, and to be paid for only those services that are reasonable and medically necessary to serve the patient.  The Medicare program operates fundamentally on an honor system, yet, for at least a decade, CHS has turned its back on these basic principles and billed Medicare and other payers for unnecessary services by at least hundreds of millions of dollars, in violation of Medicare regulations and widely accepted standards of patient care.

## A.     Background: Treating Patients According To Clinical Need

44.     When a patient enters a hospital's emergency department or is otherwise referred to the hospital, physicians have three choices when it comes to treating the patient.  First, for the most serious cases, a patient may be admitted to the hospital so that the patient may receive care that is expected to last for 24 hours or more.  Second, when a patient's medical status does not necessarily require inpatient treatment, but additional monitoring and assessment is required to appropriately care for the patient, a patient is placed into outpatient "observation" status for care

**PLAINTIFF'S AMENDED COMPLAINT - Page 20**

and monitoring that is expected to last less than 24 hours, but which may take as long as 48 hours

if the physician is unable to make a determination within a 24-hour period.  Observation patients

are regularly assessed by hospital staff during the course of their stay—often receiving the

identical care or treatment as patients who are admitted to the hospital—until the physician

determines that there is no medical need for the patient to remain in the hospital or that the

patient should be admitted.  Third, for patients with relatively minor medical needs, physicians

and nurses may provide treatment on an outpatient basis and send the patient home without that

patient being admitted into the hospital or placed into observation.

45.     The use of observation status to treat patients is widely recognized as an essential

tool for improving clinical decision making and providing cost effective medical care.  Under the

Medicare Benefit Policy Manual:

> Observation care is a well-defined set of specific, clinically appropriate services,
> which include ongoing short term treatment, assessment, and reassessment before
> a decision can be made regarding whether patients will require further treatment
> as hospital inpatients or if they are able to be discharged from the hospital.
> Observation services are commonly ordered for patients who present to the
> emergency department and who then require a significant period of treatment or
> monitoring in order to make a decision concerning their admission or discharge.

Medicare Benefit Policy Manual, Chapter 6, Section 20.6A.

46.     There are several types of patients who should be placed in observation status

rather than admitted to the hospital.[10]  For example, observation care is appropriate for patients

whose medical conditions (such as chest pain or abdominal pain) require diagnostic evaluation

because i) the balance between the probability of the disease and the dangerousness of the

disease warrants further evaluation; ii) the patient presents a condition that cannot be readily

---

[10] *See generally* Louis Graff, MD, *Principles of Observation Medicine*, *in* Observation
Medicine (Louis Graff ed. 2010), *available at*
http://www.acep.org/content.aspx?id=46142&terms=Observation%20Medicine.

diagnosed without additional testing; or iii) the physician simply needs more time to evaluate the patient's symptoms to determine the most appropriate medical treatment.

47.    Observation care also is appropriate for patients who require short-term treatment of emergent conditions.  These are patients with conditions for which there is a high probability of therapeutic success with a limited amount of services, such as patients with asthma, dehydration, or an infection.  In addition, patients who require therapeutic procedures that do not necessitate inpatient admissions, but who nonetheless require some period of hospital care, are best treated in observation.  For certain procedures performed for therapeutic (such as transfusions) or diagnostic (such as angiograms) reasons, observation treatment can expedite the performance of these procedures.

48.    The clearest beneficiaries of observation treatment are patients.  When a patient is in observation, physicians may perform necessary testing or other procedures and then continually assess and reassess the patient's condition to determine whether the patient should be sent home or admitted to the hospital.  Indeed, since many patients' conditions improve through quick, aggressive treatment, and because testing may eliminate serious risks and allow patients to return home, the vast majority of observation patients are sent home without ever being admitted to the hospital.[11]

49.    The other principal benefit of observation care is its cost effectiveness relative to inpatient treatment.  With shorter stays and typically less testing and treatments for observation

---

[11]   *See* Society of Hospital Medicine's Expert Panel on Observation Units, Adrienne Green, MD, Chair, *The Observation Unit: An Operational Overview for the Hospitalist,*, *available at* http://www.hospitalmedicine.org/AM/Template.cfm?Section=White_Papers&Template=/C M/ContentDisplay.cfm&ContentID=21890; Louis Graff, MD, et al., Impact on the care of the emergency department chest pain patient from the chest pain evaluation registry (CHEPER) study, 80 Am. J. of Cardiology 563 (Sept. 1, 1997).

patients as compared to admitted patients, observation care can be very cost effective for payers.

The decision of whether to treat a patient on an inpatient or observation basis has significant

financial ramifications for the hospital.  Indeed, according to the independent MedPAC, a

hospital may receive Medicare reimbursement of nearly 1000% more (or approximately $7000

more per patient) for treatment and billing of a chest pain patient on an inpatient admitted basis

as compared to what the hospital would receive by treating and billing the patient in observation

status.[12]  Accordingly, hospitals have a strong financial incentive to improperly steer patients

into admissions rather than treat patients appropriately on an observation basis and must employ

safeguards to ensure their billing practices are appropriate.[13]

50.     To combat this incentive, Medicare laws and guidelines prohibit hospitals from

billing Medicare for treatment of a patient admitted to the hospital unless a physician, at the time

the patient presents to the hospital, determines that the severity of the patient's condition requires

care that the physician expects to meet or exceed 24 hours, and that placing the patient in a less

intensive setting would significantly and directly threaten the patient's safety or health.  *See*

Medicare Benefit Policy Manual, Chapter 1, Section 10; Medicare Program Integrity Manual,

Chapter 6, Section 6.5.2.  In particular, under federal law, Medicare reimburses hospitals only for

treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury."

42 U.S.C. § 1395y(a)(1)(A).  In addition, Medicare Administrative Contractors who make

Medicare payments are prohibited under federal law from using Medicare funds to pay for

---

[12]  Presentation, MedPAC, "Recent Growth in Hospital Observation Care" (Sept. 30, 2010), *available at* http://www.medpac.gov/transcripts/observation%20sept%202010.pdf.

[13]  As explained below, extensive analysis of the available data demonstrates that CHS is the only major short term acute care, publicly traded hospital operator in the industry that has engaged in these unscrupulous admissions practices.

services if those services were not "medically necessary, reasonable, and appropriate for the

diagnosis and condition of the beneficiary."  Medicare Program Integrity Manual, Chapter 6,

Section 6.5.2.  In sum, federal law and applicable Medicare regulations establish that, absent a

medical need to treat the patient on an inpatient basis, rather than in outpatient observation,

Medicare is not responsible for payment of inpatient treatment.[14]

51.    How CHS sought to evade these Medicare program requirements through

developing and utilizing inappropriate inpatient admissions criteria, which resulted in admitting

patients with no medical need for inpatient treatment, is at the heart of CHS's improper

admissions practices.

**B.    CHS's Strategy Of Increasing Revenue Through Improper Patient Admissions**

**1.    In Contravention Of Medicare Rules, CHS Develops Admissions Criteria (The "Blue Book") That Systematically Steer Medically Unnecessary Inpatient Admissions At Its Hospitals**

52.    Under Medicare regulations, hospitals are required to maintain a set of admissions

criteria for determining whether a patient's condition is serious enough to warrant inpatient

treatment.  Such criteria are required to support treatment that is medically necessary.  42 C.F.R.

§ 482.30(c).

---

[14] For example, one Medicare Contractor states in its coverage policy that "[c]ertain diagnoses and procedures generally do not support an inpatient admission, and fall within the definitions of outpatient observation. . . . Uncomplicated presentations of chest pain (rule out MI), mild asthma/COPD, mild CHF, syncope and decreased responsiveness, atrial arrhythmias and renal colic are all frequently associated with the expectation of a brief (less than 24-hour) stay unless serious pathology is uncovered."  *See* Highmark Medicare Services, *Local Coverage Determination LCD L27548 – Acute Care: Inpatient, Observation and Treatment Room Services*, *available at* https://www.highmarkmedicareservices.com/policy/mac-ab/l27548-r4.html.

53.     In or around 2000, CHS developed a set of admission criteria known as the "Blue Book" for CHS physicians and case managers to use in order to *justify* the admission of a patient into a CHS hospital.

54.     Unlike the Blue Book, which is used only by CHS hospitals, the InterQual Criteria from McKesson Corporation was developed by an 1,100-member panel of independent physicians and medical professionals, and is used by approximately 3,700 hospitals, CMS, state Medicaid programs, Medicare Quality Improvement Organizations in 40 states, and various Medicaid payers and private health plans.  The InterQual Criteria are evidence-based, and, thus, contain over 16,000 references to medical literature in support of the clinical criteria by which physicians and other care providers determine whether a patient should be admitted to the hospital or treated on an outpatient observation basis.

55.     Similarly, the Milliman Care Guidelines produced by Milliman, Inc. were overseen by an experienced team of physicians and reviewed by approximately 100 independent physicians before being released to the more than 1,000 hospitals and 1,800 Milliman clients, including 25 CMS auditors and seven of the eight largest U.S. health plans, who use them.  Like InterQual, the Milliman Care Guidelines are evidence-based, and, as such, include references to over 15,000 medical journals, articles, textbooks, medical databases, and similar resources.

56.     Together, InterQual and Milliman are used by approximately three-quarters of all hospitals in the United States, with approximately 60% using InterQual and approximately 16% using Milliman.

57.     The Blue Book has none of the attributes of the industry standard InterQual or Milliman criteria.  The Blue Book, as of 2009, was merely a 40-page document that set forth the "Admission Justification[s]" for the most common medical conditions presented by CHS

patients.  The Blue Book is not independent or objective, but rather was developed by CHS and, on information and belief, has never been externally tested by physicians unaffiliated with CHS. And, unlike InterQual or Milliman, which are used by thousands of hospitals and other medical organizations across the country, the Blue Book lacks a single reference to a medical journal or other resource and is used only by CHS hospitals.

58.     To educate CHS "case managers"—CHS-employed nurses responsible for administering the Blue Book at each of CHS's hospitals—on how to utilize the Blue Book criteria to "justify" admitting patients into the hospital, CHS developed a training presentation in which CHS acknowledges that its case managers have had reservations about applying the non-standard Blue Book admissions criteria to admit patients into the hospital.

59.     For example, in a section of the training presentation entitled "Using The Blue Book," CHS warns that "[c]ase [m]anagers sometimes become overly concerned because we do not use InterQual criteria," and that "QIOs [quality improvement organizations], managed care plans, and insurance companies will sometimes attempt to make you think that you must use their criteria."  In these situations, case managers are instructed to "[p]olitely, but firmly, advise them that your hospital has adopted its own criteria and will use the same for its internal reviews."

60.     Given that the Blue Book is designed to justify inpatient admissions, rather than properly equip physicians and nurses to treat patients according to their medical needs, it is of no surprise that this training presentation never once mentions the word "observation."

**2.     The Blue Book Admissions Justification Criteria Result In Admission Of Many Patients Who, Under Standard Clinical Practice, Would Ordinarily Be Placed Into Observation Status Or Sent Home**

61.     The Blue Book not only lacks medical references, independent testing or use outside of CHS, but its criteria for admitting patients into the hospital are demonstrably more lenient, general, and subjective than the evidence-based criteria used throughout the rest of the industry.

62.     The Blue Book is organized around the most common patient conditions presented at CHS hospitals (*e.g.*, chest pain, asthma, and congestive heart failure).  For each such condition, the Blue Book presents four categories of criteria to be applied by physicians and case managers at each stage of care:  i) Admission Justification; ii) Ongoing Plan of Care; iii) Discharge Readiness; and iv) Documentation Guidelines.

63.     The very structure of the Blue Book—with its focus on "Admission Justification"—demonstrates that it is not an objective set of criteria for determining whether it is more appropriate to treat a patient in observation or to admit the patient into the hospital.  Indeed, there is but one reference to "observation status" in the entire Blue Book—for "very low risk chest pain."

64.     As set forth below, for many conditions that are common among Medicare patients, the Blue Book includes admission justification criteria that bear little relevance to determining the severity of a patient's condition, are at odds with standard clinical decision-making for determining the proper level of care for patient, and provide an improper clinical basis for admitting a patient into the hospital.  Moreover, in many cases, the Blue Book simply fails to include the core criteria utilized by physicians to determine, for a given condition, whether the patient's presenting symptoms are serious enough to require admission into the

hospital.  A few of the more egregious Blue Book deficiencies are set forth below, which highlight the Blue Book's lack of clinical foundation for its flawed admissions justifications.

**Chest Pain**

65.     The Blue Book's Admission Justifications criteria include several criteria that either are inappropriate or not relevant for physicians to consider in determining whether it is medically necessary to admit a chest pain patient to the hospital, where in the hospital the patient should be admitted and treated, or whether the patient should be treated in observation.

66.     Under standard clinical practice, when a patient presents to the hospital with chest pains, there are varying levels of care that may be provided to the patient, depending on the severity of the patient's condition.  Given that chest pain is a very non-specific complaint, meaning that there are many causes of chest pain other than a heart attack, patients often are initially evaluated in observation in order to determine whether or not they are in fact having a heart attack or suffering from a lack of oxygen to the heart.  Many chest pain patients are appropriately treated in observation, where standard tests may be run to determine whether the patient has had a heart attack, in which case the patient likely would be admitted to the hospital, and if not, the patient would likely be discharged.  Once a decision is made to admit a patient to the hospital, there are varying levels of care in the hospital depending on the severity of the patient's clinical condition.  The initial level of care for stable patients requiring admission is the inpatient general medicine or surgical floor setting.  Those requiring a higher level of care may be placed in a telemetry or intermediate care setting.  Lastly, those patients that are most critically ill may be placed in the critical care unit.

67.     The Blue Book sets forth three levels of care, and two levels of admissions for chest pain patients, each with separate "Admissions Justifications": 1) "Very Low Risk:

Observation or Discharge;" 2) "lower risk/telemetry (Green/Blue cases);" 3) "high and moderate

risk levels/CCU (Orange/Red cases)."  As set forth below, for each of these categories of care,

the Blue Book contains admissions criteria that are both inappropriate and inconsistent with

standard clinical decision-making.

**Chest Pain Observation**

68.     When a patient presents to the hospital with chest pain—one of the most common

presenting emergency room complaints—it is accepted clinical practice to run two to three sets

of blood tests on the patient every six to eight hours to measure the levels of cardiac enzymes

(specifically, a cardiac marker known as troponin) in the blood.  An elevated troponin level from

one test to the next indicates that the patient's cardiac wall likely has suffered a loss of blood

flow, meaning that the patient is at risk of suffering or having suffered a heart attack.  If, as is

often the case, the patient's troponin level does not increase from one blood test to the next, the

physician may rule out a heart attack and send the patient home.  In addition, it is standard

practice to perform two electrocardiograms ("ECGs")—which measure changes in heart rhythm

that may be indicative of a heart attack—during the same time period that the cardiac enzymes

are measured.

69.     Because these cardiac enzyme tests and ECGs may be completed in less than 24

hours, it is standard practice for these patients to be treated in observation, rather than admitted

to the hospital.  Indeed, treating chest pain patients in observation is so common that some

hospitals have observation units dedicated solely to evaluating patients complaining of chest

pain.

70.     While it is standard clinical practice to run these tests while the patient is in

observation, the Blue Book justifies placement of a patient in observation only *after* the patient

has two negative serial ECGs and two negative sets of cardiac enzyme tests.  In other words, under the Blue Book, these tests may be run on patients already admitted to the hospital.

### Chest Pain Telemetry Admissions

71.    The Blue Book Admission Justification criteria for chest pain, lower risk/telemetry are at odds with standard criteria used in practice and justify admissions where, under accepted practice, patients would not be admitted, but rather placed in observation or discharged.  For example, a patient with chest pain may be admitted to the telemetry unit rather than placed in observation if he or she merely has a general risk factor for cardiac disease (e.g. hypertension, diabetes, or hyperlipidemia) coupled with only one of the following:

> i.   New chest pain in the presence of a significant history of coronary artery disease;
>
> ii.   a recent visit to the hospital with complaints of chest pain;
>
> iii.   chest pain that may be reproduced by pressing on the chest; or
>
> iv.   "atypical symptoms," such as shortness of breath, fatigue, sleeplessness and/or anxiety.

72.    These Admission Justification criteria are weighted toward admissions and are inconsistent with accepted clinical standards for inpatient admissions, however, because many patients who present with chest pain have a history of a cardiac risk factor, such as hypertension (a very common diagnosis in the U.S. population and not necessarily indicative of a medical need for inpatient care).  Furthermore, the criteria identified in i.-iv. above are very different from the accepted clinical standards for hospital admission, such as having positive cardiac enzymes.  For example, a "recent visit to the hospital with chest pain" is considered by the Blue Book to be a criterion for admission.  While it is certainly a part of a patient's history, it is <u>not</u>

any indication of a patient's clinical severity of illness.  None of these criteria are representative of standard clinical criteria that physicians consider when deciding whether to admit a patient with chest pain to the hospital.  Under InterQual, moreover, these Blue Book criteria would not support the admission of a patient to the hospital.

**Chest Pain CCU Admissions**

73.     The same is true for the Blue Book criteria for admission to the CCU.  The CCU is reserved for patients with the most critical medical conditions who require intensive and rapid treatment for survival.  The Blue Book Admissions Justification criteria, however, include many diagnoses that have no bearing on the severity of the patient's existing illness, but rather, address only the patient's medical history or conditions that are common among many chest pain patients—conditions that should have no bearing, under standard clinical practice, on whether a patient should be placed into the CCU rather than simply admitted to the general medical floor. For example, the Blue Book Admission Justification criteria for admission to the CCU include several criteria, two or more of which must be met to justify an admission to the CCU.  Several of these criteria, however, are out of line with standard clinical decision-making, including the following:

     i.   A history of smoking, hypertension, hyperlipidemia, or diabetes;

    ii.   Two or more episodes of pain;

   iii.   Oxygen saturation less than 90;

   iv.   Rest angina less than 20 minutes (resolved with rest or nitrates); and

    v.   Indeterminant CKMB or Troponin.

74.     Each of these criteria is not relevant to the determination of whether care in the CCU is medically necessary.  For example, whether a patient is a smoker or has hypertension,

for example, has no bearing on the severity of the patient's condition and certainly does not

inform the need for CCU admission.  Chest pain patients frequently present with two or more

episodes of pain, meaning that this criteria is not indicative of the severity of a patient's chest

pain necessary to require the highest level of care.  Patients with an oxygen saturation less than

90 is extremely common, not in and of itself life threatening, and easily treatable with

supplemental oxygen.  When a short period of rest angina occurs and is resolved with rest or

nitrate therapy, there is no medical necessity of treating such patients in an intensive care setting,

which is reserved for the most critically ill patients.  And whether the results of a patient's

CKMB or troponin levels is "indeterminant" is not, under standard clinical practice, a

justification for admitting the patient into the CCU, but rather, an indication that further testing

should be performed.

<p align="center">* * * * *</p>

75.     In sum, in many cases where the Blue Book criteria inappropriately warrant a

hospital admission for a chest pain patient, current accepted clinical practice standards justify

placing the patient in observation status.  In the case where patients present with chest pain, the

standard of care through an electrocardiogram and cardiac enzyme blood testing may be used to

determine whether or not a patient may be having a heart attack.  If so, then patients may then be

admitted to the appropriate inpatient setting and appropriate level of care intensity.  Patients that

are ruled out for an acute heart attack, as the vast majority of "chest pain" patients are, may be

discharged home.

**Syncope Or Pre-Syncope**

76.     In addition, the Blue Book's Admissions Justifications include many criteria that are inappropriate for determining whether a patient with pre-syncope or syncope (dizziness or fainting) should be admitted to the hospital or should instead be treated in observation.

77.     Under standard clinical practice, when a patient presents to the hospital complaining of dizziness (pre-syncope) or fainting (syncope), the physician performs several tests to eliminate any critical causes that may be responsible for these episodes, such as the potential for a heart attack, a stroke in the brain, or some form of structural heart disease or acute heart arrhythmia.  These tests are standard in most hospital settings and can be performed within a 24-hour period.  Such patients typically are placed in observation so that these critical, though rare, causes of syncope may be ruled out.  Once they have been, syncope or pre-syncope is often due to dehydration (as determined by measuring a patient's drop in blood pressure between lying down and standing up) or by a vasovagal reaction (a very common cause of fainting in adults).  Both of these etiologies are much less critical and can be treated simply in observation.  Patients with dehydration will be rehydrated during their observation stay through IV fluids, and, as long as the syncope does not recur, will be sent home.  Patients with vasovagal episodes will follow up with their primary care physician as an outpatient, with further treatment if the episodes recur.  Regardless, these patients typically are treated in observation.

78.     The Blue Book Admission Justification criteria, however, call for the admission of a patient who has an episode of fainting and is over the age of 60.  Age, however, is irrelevant in the case of syncope.  Regardless of the etiology, age is not a risk factor for syncope, and all patients, regardless of age, will undergo the same workup and battery of testing discussed in the previous paragraph, which are appropriately conducted in observation.  Additionally, the Blue

Book admissions criteria include patients who have a "Postural BP greater than 15 mm," indicating that patients found to have a positive "orthostatic testing" (such as a drop in BP of great than 15 mmHg between a standing and sitting position) may be admitted. However, such a blood pressure drop is due to dehydration, which is something easily treated in an observation status with intravenous fluids and rehydration. Once again, this criterion is not a clinically accepted standard of care for determining whether it is medically necessary to admit a patient to the hospital.

79. In comparison, InterQual states that the criteria for observation are, as described above, pre-syncope or syncope of unknown etiology. This is appropriate and consistent with accepted standards of clinical care. Once a patient is found to have a more critical cause of syncope, such as structural heart disease or an arrhythmia, the InterQual Criteria indicate that it is reasonable to admit such patients to the hospital, but the majority of patients are simply dehydrated, treated with IV fluids in observation, and discharged home.

**Community Acquired Pneumonia ("CAP")**

80. The Blue Book's Admission Justifications criteria ignore accepted clinical practices for determining whether a patient presenting with CAP is ill enough to require inpatient treatment, or whether the patient could, instead, appropriately be treated in observation.

81. Admission of a patient with CAP is justified under the Blue Book if the patient presents with a cough and rales (the presence of fluid in the lungs). But many patients who have pneumonia—regardless of severity—have the presence of a cough and rales on exam. Thus, the mere existence of these findings tells the physician nothing about whether a patient presenting with a cough and rales has a clinical picture that correlates with severity of illness requiring admission to the hospital.

82.     Similarly, an admission of a patient with CAP is justified under the Blue Book if the patient presents with a cough and infiltrate or atelectasis.  Again, the mere existence of a cough and abnormal chest X-ray is only relevant to informing the physician that the patient may have CAP; standing alone, the presence of these findings provides information on a possible diagnosis, but does not justify hospital admission.  Clinical presentation, a critical component of the decision-making process regarding admission or observation, is not taken into account in the Blue Book.

83.     Under the InterQual Criteria, patients presenting with a cough and rales or an abnormal chest X-ray are not, absent other symptoms, admitted to the hospital for treatment.  Instead, such patients would be examined to determine whether they have an elevated breathing rate, a fever, or a high white blood cell count, and most importantly, whether the patient is 65 or older.  In the absence of serious additional criteria (for example, a breathing rate above 29), the patient would be treated in observation with IV antibiotics and monitored for up to 24 hours for improvement.  In the typical case where the patient responded favorably to such treatment, the patient would be sent home, and if the condition worsened, the patient would be admitted to the hospital.

84.     Finally, the Blue Book permits the admission of a CAP patient who presents with a cough and a temperature of 102 degrees with a white blood cell count of 15,000 or greater.  It is well accepted, however, that a patient's temperature and white blood cell count—standing alone—do not necessarily have a strong correlation with the severity of disease without consideration of age and presence of co-morbidities.  Thus, absent other factors (such as advanced age or a disease that weakens a patient's immune system), there is no absolute clinical

basis for inpatient admission when a pneumonia patient has an elevated temperature and white blood cell count.

## Atrial Fibrillation

85.     The Blue Book Admission Justification criteria contain non-standard and clinically inappropriate justifications to admit patients with atrial fibrillation, which is an irregular beating of the heart.

86.     For example, under the Blue Book, patients with an irregular heart beat may be admitted to the hospital if they also have potassium levels higher or lower than normal, or if a chest X-ray shows an "increased heart silhouette." But under standard clinical practice, neither of these factors bears any direct relation to determining whether or not a patient's atrial fibrillation is serious enough to warrant treatment as a hospital inpatient. Accordingly, neither of these criteria is included in the InterQual Criteria as a basis for admitting the patient to the hospital.

87.     Patients in the hospital often present with abnormally low potassium levels—a condition that may be easily treated through a potassium supplement. Because, in most patients with normally functioning kidneys, potassium levels typically normalize within a few hours of treatment, atrial fibrillation patients with abnormal potassium levels may often be treated in observation and discharged within a few hours later when their condition improves. Under the Blue Book criteria, however, a patient with an irregular heartbeat and low potassium levels may be admitted to the hospital *before* receiving a simple potassium supplement. Such patients with only atrial fibrillation and abnormal potassium levels will typically recover within a few hours and be sent home, but will still be billed as an inpatient, as an observation stay.

88.     An enlarged cardiac silhouette, another Blue Book criterion for atrial fibrillation admission, provides no basis for determining the severity of a patient's atrial fibrillation.  The appearance of an enlarged heart silhouette is very non-specific and may be artificially represented by poor X-ray technique, an overweight patient, or by patients who fail to take a deep breath during the X-ray.  Thus, this criterion typically is not reflective of any medical condition, and, in any event, provides no basis for determining whether an atrial fibrillation patient should be admitted to the hospital rather than treated and monitored in observation or discharged to home with outpatient evaluation.

**GI- Hemorrhage (Bleed)**

89.     The Blue Book also fails to consider key criteria that are clinically necessary to determine whether it is medically necessary to admit to the hospital a patient presenting to the hospital with a gastrointestinal bleed (blood in the stool or vomitus).

90.     The Blue Book ignores essential testing that, under standard clinical practice, must be performed so that medical staff may determine whether a patient's gastrointestinal bleeding is serious enough to require inpatient treatment or, instead, whether the patient may be treated with blood products and fluids in observation and monitored for improvement.  Many patients who have stable hemoglobin levels over 24 hours of observation may be sent home and followed up as an outpatient with several tests to identify the source of bleeding.  Alternatively, some patients may receive these tests within 24 hours of admission and be discharged home from observation once these tests are completed.  Furthermore, it is standard for doctors to run tests to measure the patient's hemoglobin or hemotocrit (the concentration of red blood cells in the body), the rate of decrease of hemoglobin, and to check an International Normalized Ratio ("INR"), to determine the "thinness" of the blood and the risk for further bleeding.  Under both

**PLAINTIFF'S AMENDED COMPLAINT - Page 37**

the InterQual Criteria and standard clinical practice, these tests largely determine whether a patient with gastrointestinal bleeding should be admitted to the hospital.

91.     By ignoring these widely used tests, the Blue Book provides yet another clear, non-standard set of admission justifications to admit patients who, under standard practice, are most appropriately treated in observation with IV fluids and blood products, monitored, and discharged when their condition improves and hemoglobin has stabilized.

**Cellulitis**

92.     The Blue Book's Admission Justification criteria also are deficient when applied to patients presenting with signs of cellulitis, an infection of the skin that can cause pain, fever, and elevated white blood cell counts.

93.     For example, under the Blue Book, a patient presenting with a possible cellulitis and either an elevated white blood cell count and a temperature over 102 degrees, or a "weeping wound," may be admitted to the hospital.  Again, these admission criteria fall outside accepted clinical practice as they individually do not provide evidence as to the severity of a patient's cellulitis.  A patient presenting with only these conditions would not, under InterQual, be admitted to the hospital.  Such patients would either be effectively treated with IV antibiotics in observation for 24 hours and discharged when their condition improved, as cellulitis often does with 24 hours of antibiotic treatment, or would be given one dose of IV antibiotics in the emergency room and sent home with antibiotics by mouth and a follow up appointment soon after the ER visit.

94.     What the Blue Book Admission Justification criteria altogether ignore is the critical question regarding complexity and severity of cellulitis, a question that doctors often face when determining whether a patient may be treated in observation or admitted to the hospital for

treatment, and the length of time that would be required to treat a cellulitis patient with IV antibiotics.  This determination is driven by the part of the body that is affected (cellulitis of the face, hand, or foot is more difficult to treat than the upper arm, thigh, or calf); co-existing medical conditions of the patient (patients with diabetes face greater risk associated with cellulitis, often supporting inpatient treatment); and signs of sepsis or shock (patients with low blood pressure, acute confusion, or bacteria in the blood are at the highest risk for complications).  These widely accepted clinical factors are primary considerations under the InterQual admissions criteria, but under the Blue Book, less clinically relevant factors are considered to justify inpatient admissions.

95.     Accordingly, the Blue Book not only presents overly general and non-clinical bases for admitting a cellulitis patient to the hospital, but omits several key criteria that physicians must consider to determine whether a patient's condition is serious enough to require inpatient treatment.  These deficient Blue Book Admission Justifications, therefore, far more readily justify admitting a cellulitis patient as an inpatient than if the patient were evaluated using accepted clinical criteria and practices.

### 3.     Additional Strategies Through Which CHS Bills Patients As Admitted Who Should Be Treated In Observation Or Discharged

96.     As set forth above, the Blue Book contains far more subjective and liberal criteria for admitting patients into the hospital than accepted clinical decision-making and the evidence-based, clinical criteria used by peer hospital systems across the country.  Thus, a patient who visits a CHS hospital is much more likely to be admitted into the hospital than if the same patient visited any other hospital that admits properly patients on the basis of clinical need.  But CHS's application of liberal Blue Book "Admission Justification" criteria is just one tool among many by which CHS has increased its admission—and driven down its observation—rates at its

hospitals, none of which have been fully and adequately disclosed.  As set forth below, CHS has created a culture at its hospitals whereby patients are admitted by default and where observation is highly discouraged, even in cases where diagnostic testing or short term treatment that should be performed in observation is the medically appropriate and best course of care for the patient.

**Additional Clinical Examples Where CHS**
**Improperly Admits, Rather Than Observes, Patients**

97.     Given the liberal and unspecific nature of the Blue Book Admission Justification criteria, many patients who present to the ED frequently are admitted to the hospital when simple testing or treatment should, under standard clinical practice, be done in observation.

98.     For example, patients who visit a CHS hospital through the ED frequently are diagnosed with acute renal failure (and thus automatically admitted as inpatients) merely when they present with elevated creatinine levels.  However, elevated creatinine levels often are present in cases of dehydration, a much less serious condition that does not typically necessitate admission.  Thus, the accepted medical practice for patients with elevated creatinine levels is to place them in observation and give them fluids.  If, as is typically the case, the patient's creatinine levels return to normal within 24 hours of receiving IV fluids, the physician can rule out acute renal failure and send the patient home.  What CHS affiliated physicians often do for such patients, however, is admit them, rather than treat them with fluids in observation.  Then, after the admitted patient has been treated with fluids and his or her creatinine levels have returned to normal within 24 hours, the patient is sent home.  However, CHS still bills Medicare for an admitted patient under the initial diagnosis of acute renal failure, at a significantly higher cost than if the patient had, under standard clinical practices, been treated in observation.

99.     Another example of the practice at CHS hospitals of admitting patients with symptoms best treated in observation status concerns patients presenting to the ED with chest

pain, described in the previous section.  Because the battery of tests run on virtually all chest pain patients may be completed in less than 24 hours, it is standard practice for these tests to be run on patients in observation status.  At CHS hospitals, however, patients complaining of chest pain often are admitted to the hospital rather than treated in observation.  Indeed, at some CHS hospitals, such as DeTar hospital in Victoria, Texas, even patients whose first set of cardiac enzyme tests and ECG results taken in the ED show no sign of a heart attack are nonetheless admitted to the telemetry unit.  If the clinical tests reveal that the patient has not had a heart attack, the patient will be discharged from the CHS hospital after only a short stay at the hospital (often only a single day), but that patient still will be billed to Medicare as an inpatient, at far greater cost than if the same treatment had been provided to the patient in observation.

100.     In each of these examples, there is no medical need to admit the patient to the hospital.  Indeed, the clinically appropriate decision is to place the patient into observation, run the necessary tests or provide the necessary treatment that will allow the physician to rule out the more serious condition, and then discharge the patient.  In the event that the tests or treatment does not eliminate the more serious condition, the physician will then admit the patient to the hospital for further treatment.  Through the Blue Book and CHS's drive to increase admissions, regardless of the medical needs of its patients, CHS turns medical practice on its head by steering the admission of these patients immediately, quickly discharging the patients after tests and/or treatment rule out the serious condition, and then billing Medicare for the far more expensive— and wholly unnecessary—inpatient treatment.

101.     In short, CHS has ignored Medicare rules by creating criteria and enforcing practices under which the admissions criteria applied by its physicians steer the physicians to

inappropriately conclude that a patient's care requires inpatient admission, thus ignoring a clinically based standard of "reasonable and necessary" or "medically necessary" care.

**Financial Incentives And Enforcement Mechanisms To Help
Ensure That CHS And CHS-Affiliated Personnel Meet CHS's Admissions Targets**

102.    CHS also has adopted a strategy of setting admission targets for its hospitals, and on information and belief, incentivizing physicians to meet admission targets, and holding physicians and hospitals accountable for failure to meet those targets.  For example, on information and belief, CHS sets targets for each of its hospitals to convert ED patients into admitted patients.  These targets, which typically are posted in plain view throughout the hospital (in the lunch room, for example), are based not on the medical needs of a hospital's patients or, critically, the patient mix of a particular hospital, but on an artificial goal meant to increase each hospital's admission rate.  For example, at Mat-Su Regional Medical Center—a former Triad hospital—the ED conversion rate for many years had been approximately in the 9 to 10 percent range.  Notwithstanding the relatively young population in the immediate vicinity—meaning fewer elderly patients who are more likely to require an appropriate admission to the hospital—CHS management set an admission target at Mat-Su of 12 to 15 percent, and expected the hospital's ED doctors to meet that goal.  With this improper emphasis on increased inpatient admissions (and restricting outpatient status), it is unsurprising that in the year following CHS's acquisition of Mat-Su, the hospital's observation rate plummeted from 10.01% to 2.83%—a stunning 72% one-year drop.

103.    Upon information and belief, CHS physicians and ED doctors working in CHS hospitals also receive bonuses based in part on the number of patients admitted to the hospital— part of CHS's goal of converting between 17 and 20 percent of all ED visits to inpatients.  In establishing these artificial targets, CHS has ignored that patients should be admitted to the

hospital from the ED based on their clinical indications and needs, and not based on maximizing profits.

104.    In addition to financial incentives, on information and belief, CHS management also sought to strong-arm ED physicians to increase their admission rate by tracking each physician's individual rate and terminating ED physicians who failed to meet CHS's admission targets.  For example, CHS held weekly division conference calls to review ED conversion percentages.  On information and belief, when an individual ED physician had a conversion rate below the admission target set by CHS, the CEO of that CHS hospital would attempt to force the ED physician to increase his or her admissions.  If the situation were not corrected, the ED physician would be disciplined or fired.  This system—in which CHS management kept tabs on the individual admission rates of each ED physician and punished physicians who failed to admit patients at a rate CHS deemed appropriate—has created a culture in which ED physicians, at the direction of CHS hospitals, seek to admit patients whose medical condition does not require inpatient treatment.  In addition, on information and belief, a former CHS senior executive regularly instructed individual CHS hospital CEOs, at quarterly orientation and annual CEO meetings, that physicians at CHS hospitals were required to use the Blue Book to achieve higher inpatient conversion rates in CHS EDs and to avoid the use of observation status.

105.    To comply with CHS-mandated admissions targets and to increase hospital revenue by admitting, rather than observing, patients, CHS hospital CEOs, on information and belief, also frequently reverse physician decisions to place patients in observation status.  To take just one example of a wide-spread phenomenon at many CHS hospitals, on information and belief, at DeTar Healthcare System in Victoria, Texas—a former Triad hospital—the hospital's CEO, William R. Blanchard, made clear to hospital staff, doctors, and case managers that it was

essential to adhere to CHS's policy of admitting patients to the hospital, rather than placing them in observation status, because the hospital would earn substantially more revenue for inpatient treatment.  On information and belief, during the 2008 and 2009 time frame, the DeTar executive staff held daily "flash" meetings during which the staff would present to Blanchard, among other things, patients who had recently been placed into observation status.  Upon learning this information, Blanchard would, during the flash meeting, call the physician who placed the patient into observation status and instruct the physician that the patient should be removed from observation and admitted to the hospital.  Unsurprisingly, in the year following CHS's acquisition of DeTar, the observation rate at DeTar plummeted by over 47%.

106.    Moreover, during this same time frame, it was standard practice at DeTar, on information and belief, to admit into the inpatient telemetry unit patients who presented to the ED with nothing more than chest pain.  Indeed, patients whose initial cardiac enzyme test and ECG while in the ED showed no sign of a heart attack—strongly suggesting that the patient would have no medical need for inpatient treatment—still would be admitted to the telemetry unit for treatment and then discharged shortly thereafter, with DeTar billing Medicare for inpatient treatment, rather than observation.

107.    Thus, by setting lofty admission targets, tracking ED physician admission rates, rewarding or punishing ED physicians based on their compliance with artificial targets, and, in some cases, reversing altogether the decision by ED physicians to place patients in observation status rather than admitting them as inpatients, CHS management created a culture—unique in the hospital industry—in which patients were admitted to the hospital despite no medical need for inpatient treatment.

**CHS's Use Of The Pro-MED System To Drive Improper Admissions**

108.    CHS's culture of boosting inpatient admissions rates for financial rather than clinical reasons is further demonstrated by its use of the third-party ED system designed by Pro-MED Clinical Systems, LLC ("Pro-MED").[15]  On information and belief, Pro-MED is used in the EDs of all CHS hospitals.  On information and belief, Pro-MED is an electronic charting system that contains "quality flags" that track when a patient has symptoms or conditions that, under the hospital-defined admissions criteria, should be admitted to the hospital.  Although, on information and belief, Pro-MED does not require that a physician perform a particular test on a patient, Pro-MED will raise quality flags to identify when a patient has a symptom that requires some type of treatment or test result before the quality flag may be removed.  CHS, on information and belief, has utilized Pro-MED as yet another tool to justify inappropriate admissions by using the Pro-MED quality flags to justify admissions.

109.    At CHS hospitals, Pro-MED is used only in the EDs.  Specifically, when a patient presents to a CHS hospital ED, the patient's information, including medical symptoms, are entered into Pro-MED by the ED physician or an ED nurse.  Based on these inputs, Pro-MED will instruct the ED physician to conduct particular tests or provide particular treatment to the patient based on the patient's symptoms.  As the patient is treated, Pro-MED will raise quality flags that require some form of treatment or testing by the physician before the flag may be removed.  On information and belief, Pro-MED often will raise a quality flag despite there being little or no clinical need for the physician to provide treatment required to remove the flag, which generates substantial revenue for the CHS hospital.

---

[15] CHS recently disclosed, only after Tenet initiated this litigation, that both the Texas Attorney General and the OIG were investigating CHS's use of Pro-MED in connection with their respective inquiries into CHS's billing practices.

110.    Importantly, it is CHS policy that a patient should not be discharged from the ED when one or more quality flags remain for a patient.  While physicians may "check off" certain of the quality flags, some cannot be removed.  Thus, even if the ED physician believes that a patient should be discharged notwithstanding an ongoing symptom (because the physician independently concluded that there was a clinical reason to override CHS's non-clinical interpretation of the symptom in Pro-MED), under CHS policy, the patient should be admitted to the hospital, rather than discharged.  Although the physician may still send the patient home, he or she does so knowing that CHS tracks the number of patients each physician discharges with quality flags—even if, according to standard clinical practice, sending the patient home is the right thing to do.  On information and belief, if an ED physician continued sending patients home with (non-clinical) quality flags, the CHS hospital will request that the company providing the ED doctors to the CHS hospital replace such an ED physician with a physician more willing to follow CHS policy and admit patients with CHS-derived quality flags.

111.    Moreover, Pro-MED itself states that its case management software uses "hospital-defined admissions criteria," "[a]lerts clinicians when a patients meets criteria for case management consultation – *before* they are discharged," and "[p]rovides prompts for required documentation to *support deserving admissions*."  Thus, according to Pro-MED itself, the hospital using the software—here, CHS—defines the relevant admissions criteria and whether a patient "deserves" to be admitted.  Pro-MED also touts its ability to "[m]aximiz[e] the hospital's revenue potential" and "optimiz[e] billing opportunities," and benefits its users through "[c]ompelling ROI delivering hard dollar results."

112.     Thus, on information and belief, Pro-MED, used in conjunction with the Blue
Book, is yet another tool for systematically admitting ED patients to the hospital despite no
medical need for inpatient treatment.

**4.      CHS's Admissions Scheme Has Been Enormously Effective At
Lowering Observation Rates And Increasing Admission Rates At
CHS Hospitals**

113.     Together, CHS's use of the Blue Book, ED conversion targets and enforcement
mechanisms, and Pro-MED—none of which have been adequately disclosed to Tenet's
shareholders and the investing public—enables it to actively drive up inpatient admissions and
drive down outpatient observation.  When CHS's observation data is compared to the industry in
general and to well-known hospital operators that compete with CHS, the full impact of this
conduct is laid bare.[16]

---

[16] The slides set forth in the remainder of this section of the Complaint were prepared by
Avalere based on information contained the CMS Outpatient SAFs and the Inpatient SAFs,
the latter of which contains source data from which the MEDPAR database is constructed.
As set forth in footnote 7 above, the conclusions set forth in these charts were independently
reached by a separate consultant utilizing data from the American Hospital Directory.

114.    In 2009, for example (the last full year for which data are available), CHS's observation rate was less than half the industry average.[17]   Under a standard two-tailed t-test, moreover, CHS's difference from the national average is statistically significant (p-value ≤ 0.05), meaning that this difference is extremely unlikely to have been the result of chance.



_____

[17] This analysis excluded from the hospital sample (including certain CHS hospitals) non-short term acute care hospitals (*i.e.*, psychiatric, children's, long term, and rehabilitation), critical access hospitals, and hospitals that did not bill for emergency department visits and/or observation.  Because the last full year for which data is available is 2009, the CHS hospitals included in the analysis do not include four CHS hospitals acquired in 2010.  Another hospital system, Universal Health Services ("UHS"), is not separately identified in this analysis because, given its hospital makeup, is not a true comparable to CHS or the peer hospital systems identified in the chart above.  Tenet did not consider Universal a peer of CHS due to the fact that Universal has only 22 short-term acute care hospitals.  22 hospitals is less than half the number of the next smallest company in the comparison set identified in the complaint.  Nor did Tenet separately identify other small investor-owned hospital companies, such as Vanguard (15 hospitals in 2009,) Iasis (15) and Capella (13).  In other words, given that only 22, or approximately 20%, of Universal's hospitals were left as true comparators to CHS and its peers, Universal would not have been appropriately included as a CHS peer company for present purposes.

115.    Nor can CHS's abnormally low observation rate be explained by the fact that it falls within one standard deviation of the national mean observation rate.  As the chart below demonstrates, the standard deviation is an irrelevant analytical tool with respect to CHS's low observation rate because the distribution of observation rates across all hospitals is not normal, meaning the distribution does not follow a "bell shape."



116.    CHS's low observation rate relative to the industry and its competitors is not driven by a small sample of CHS hospitals.  To the contrary, nearly 95% of CHS's short-term acute care hospitals included in the analysis have observation rates below the national average,

with nearly 70% of CHS's hospitals falling more than 50% below the national average.



117.   CHS's observation rate also is significantly below the rates at some of the most highly respected not-for-profit hospitals in the country.



118.    CHS's rural hospital base in no way explains its low observation rate relative to the industry, since hospitals in the immediate vicinity of CHS have a substantially higher observation rate than CHS hospitals.  Under a standard two-tailed t-test, moreover, CHS's difference from its geographic peers is statistically significant (p-value ≤ 0.05), meaning that this difference is extremely unlikely to have been the result of chance.



119.    CHS's low observation rate relative to the industry also does not vary based on the type of CHS facility included in the sample.[18]  CHS's divergence from hospitals

---

[18] Inpatient Prospective Payment System ("IPPS") hospitals receive fixed payments for acute care hospital stays, based on prospectively set rates.  A Medicare Dependent Rural Hospital ("MDRH") is (1) located in a rural area; (2) has no more than 100 beds; (3) is not classified as a Sole Community Hospital ("SCH"); and (4) has at least 60 percent of inpatient days or discharges covered by Medicare.  A Medicare Dependent (Non-Rural) Hospital meets criteria 2-4 in the previous sentence.  An SCH is (1) 35 miles from a like hospital; (2) between 15 and 25 miles from a like hospital and nearby hospitals have been inaccessible for at least 30 days in 2 out of 3 years due to weather or local topography; or (3) is between 25 and 35 miles from a like hospital and either (a) has fewer than 50 beds, (b) nearby hospitals have been inaccessible for at least 30 days in 2 out of 3 years due to weather or local topography, or (c) no more than 25 percent of all inpatients or inpatient Medicare beneficiaries in its service

[Footnote continued on next page]

across facility type is statistically significant (p-value ≤ 0.05), meaning that these differences are extremely unlikely to have been the result of chance.



[Footnote continued from previous page]

area are admitted to other like hospitals within 35 miles.  A SCH (Rural) is a SCH located in a rural area.  Finally, a hospital qualifies as a Rural Referral Center ("RRC") if it (1) has at least 275 beds; (2) demonstrates that at least 50 percent of Medicare patients are referred from other hospitals or from physicians not on the hospital staff, at least 60 percent of Medicare patients live more than 25 miles away, and at least 60 percent of the Medicare services it furnishes are provided to beneficiaries who live more than 25 miles away; or (3) demonstrates that it has a case-mix index value greater than or equal to the median for all urban hospitals in the same census region, and has at least 5,000 discharges per year (3,000 for osteopathic hospitals) or at least the median number of discharges for urban hospitals in the same region, and either (a) more than 50 percent of its medical staff are specialists; (b) at least 60 percent of its discharges are for inpatients residing more than 25 miles away, and (c) at least 40 percent of its inpatients are referred from other hospitals or from physicians not on the hospital staff.

120.    CHS's use of its Blue Book criteria to improperly drive up admissions and drive down observation rates is most apparent through CHS's acquisition of Triad's hospitals in 2007. As set forth in the tables below, in 2006—before the acquisition—Triad's observation rate far exceeded CHS's rate.  And, once again, under a standard two-tailed t-test, CHS's divergence from the national average observation rate is statistically significant (p-value ≤ 0.05), meaning that this difference is extremely unlikely to have been the result of chance.



121.    But in the year following CHS's acquisition of Triad, CHS had drastically reduced the observation rate at the former Triad hospitals through the implementation of its Blue Book admissions practices.  Again, these results are statistically significant (p-value ≤ 0.05), meaning that this difference is extremely unlikely to have been the result of chance.



122.    According to industry data, moreover, CHS sees lower acuity patients than the national average.  Specifically, the average CHS hospital has a lower case mix index ("CMI") (1.29) than the national average inpatient short-stay acute care hospital (1.43).  Hospitals with lower CMI are expected to have a higher observation rate, but CHS has a lower than average observation rate and a lower than average CMI.  That CHS's observation rate is so low despite its lower acuity patients further demonstrates the extent of CHS's improper admissions practices.

123.    Thus, under any measure, CHS's improper practices to inflate inpatient admissions and drive down observation rates at its hospitals, thus creating excessive revenues and profits, have been remarkably effective.

5. **The Medicare Claims Data Shows That CHS Is Admitting Patients Who Would Be Observed At Other Hospitals**

124.   The Medicare claims data shows unmistakably that CHS's below average observation rate is a direct result of its admission of patients who would be placed in observation status at other hospitals.

125.   Specifically, Avalere, an independent consultant engaged by Tenet because of its expertise in Medicare data analyses, conducted an analysis to determine whether the Medicare data showed that CHS's low observation rate could be explained by higher than average numbers of patients who, instead of being placed in observation status, are simply treated in the ED and discharged home.  For this analysis, Avalere calculated (1) CHS's "ED-to-Observation" rate as the percentage of all patients presenting to CHS EDs who are treated in observation status; (2) CHS's "ED-to-Inpatient" rate as the percentage of all patients presenting to CHS EDs who are admitted to a CHS hospital; and (3) CHS's "ED-to-Home/Other" rate as the percentage of all patients presenting to CHS EDs who are treated in the ED on an outpatient basis and then discharged home.[19]

126.   Under this methodology, CHS's ED-to-Observation rate (2.01%) is approximately 57% below the national average (4.72%).  Again, under a standard two-tailed t-test, CHS's divergence from the national average is statistically significant (p-value $\leq 0.05$), meaning that this difference is extremely unlikely to have been the result of chance.

---

[19]  The ED-to-Observation, ED-to-Inpatient, and ED-to-Home/Other rates of the hospitals in the study were adjusted for patient case-mix, teaching status, urban/rural, disproportionate share and size.



## Taking All Medicare Patients Presenting to the ED, CHS Observes Patients at a Rate Substantially Below the National Average and Its Peers

**Comparison of Average (Volume-Weighted) Adjusted Medicare ED-to-Observation Rates by Hospital System, 2009**

Note: 1. "ED-to-observation" rate is the total unique observation claims divided by the sum total of unique observation claims, total unique inpatient short-stay acute care hospital claims, and total unique counts of all other outpatient claims. 2. ED-to-observation rates are adjusted for patient demographics; primary diagnosis; secondary diagnosis CC and MCC; and hospital urban/rural location, number of beds and teaching and DSH status. *National Average is the average of the study-eligible hospitals in our dataset, defined as hospitals that report billings for emergency department and observation stays. **CHS includes hospitals acquired from Triad in 2007. Source: Centers for Medicare & Medicaid Services' Outpatient Standard Analytic Files (SAFs) for CY 2009 and the Inpatient Prospective Payment System SAFs for CY 2009.

127. Nor can CHS's abnormally low ED-to-Observation rate be explained by the fact that it falls within one standard deviation of the national mean ED-to-Observation rate. As the chart below demonstrates, the standard deviation is an irrelevant analytical tool with respect to CHS's low ED-to-Observation rate because the distribution of ED-to-Observation rates across all hospitals is not normal, meaning the distribution does not follow a "bell shape."

## Distribution of Adjusted ED-to-Observation Rates at All Short-Term Acute Care Hospitals with ED and Observation Claims, 2009

**The use of standard deviation is not statistically meaningful. A normal distribution would include ED-to-observation rates below zero, which is impossible.**

Notes: 1. ED-to-observation is calculated as total unique observation claims divided by the sum total of unique observation claims, total unique inpatient claims, total unique inpatient short-stay acute care hospital claims, and total unique counts of all other outpatient claims. 2. ED-to-Observation rates are adjusted for patient demographics; primary diagnosis; secondary diagnosis CC and MCC; and hospital urban/rural location, number of beds, and teaching and DSH status. 3. Patients included in this analysis are limited to those with ED revenue center charges on their claims. 4. Dark vertical lines show weighted national average and ±1 standard deviation. 5. Curved line shows a normal distribution that best fits the national ED-to-observation rate data



128.    Importantly, this analysis shows that CHS's ED-to-Home/Other rate is virtually

the same as (in fact, slightly lower than) the national average and within the same range as its

peer hospital operators.  Accordingly, CHS's low observation rate *is not* explained by a higher

than normal ED-to-Home/Other rate.



129.    Finally, the Medicare data shows that, CHS has a much higher ED-to-Inpatient

rate than the national average, and a higher rate than most of its peers.  Again, under a standard

two-tailed t-test, CHS's divergence from the national average is statistically significant (p-value

≤ 0.05), meaning that this difference is extremely unlikely to have been the result of chance.



130.     Critically, Avalere's analysis of the Medicare data shows that CHS's low ED-to-Observation rate correlates with its high ED-to-Inpatient rate relative to the industry.  In other words, CHS is not sending home patients who would be observed at other hospitals.  Rather, CHS is *admitting* these would-be observation patients to the hospital, generating substantially more revenue than if these patients had been observed after assessment and stabilization in the ED.  Once again, under a standard two-tailed t-test, CHS's lower-than-average ED-to-observation rate, and higher-than-average ED-to-inpatient rate are statistically significant (p-value ≤ 0.05), meaning that these differences are extremely unlikely to have been the result of chance.



131. The same trend—CHS's lower than average observation rate mirrored by a higher than average admission rate—is seen when CHS is compared to its nearby competitors. Again, these results are statistically significant (p-value $\leq 0.05$), meaning that CHS's divergence from its nearby peers in ED-to-observation and ED-to-inpatient rates is extremely unlikely to have been the result of chance.



132.    Across common patient conditions, moreover, such as chest pain, syncope and GI hemorrhage, CHS's over-admission and under-observation trends are even more pronounced. For each of these conditions, CHS's substantially higher-than-average admissions rate is approximately double (on a percentage point basis) CHS's substantially below average observation rate.  And, again, under a standard two-tailed t-test, CHS's divergence from the national average ED-to-observation and ED-to-inpatient rates are statistically significant (p-value ≤ 0.05), meaning that these differences are extremely unlikely to have been the result of chance.



133.    Thus, based on publicly available Medicare data, CHS is irrefutably admitting— *not* sending home from the ED—patients who would be observed at other hospitals.

### 6.    As A Result Of Admitting Patients To The Hospital Who Should Have Been Treated In Observation, A Disproportionate Share Of CHS's Admissions Are "One-Day Stays"

134.    Given that CHS admits a significant number of patients who should be treated in observation, CHS has a higher-than-average percentage of admitted patients who are discharged after just a single day in the hospital—a metric that Medicare considers a red flag for patients

who may not have required treatment on an inpatient admitted status.  As set forth below, CHS's

one-day stay percentage exceeds both the national average and the rate of its closest peers.

Under a standard two-tailed t-test, CHS's divergence from the national average is statistically

significant (p-value ≤ 0.05), meaning that the difference is extremely unlikely to have been the

result of chance.



135.    Most telling, however, is the spike in one-day stays among patients admitted through the ED at CHS's hospitals acquired over the past several years—and in particular the Triad hospitals—in the year following their acquisition by CHS.  At Triad, for example, the percentage of ED admissions that were one-day stays jumped nearly 33% in just one year following the acquisition by CHS—yet another clear sign that, under CHS, Triad's hospitals were inappropriately admitting patients who should have been treated in observation status. And, again, under a standard two-tailed t-test, the difference in one-day stays at Triad from 2007 to 2008 is statistically significant (p-value ≤ 0.05), meaning that the difference is extremely unlikely to have been the result of chance.



136.    Across all CHS acquisitions, including Triad, moreover, the same holds true: the percentage of one-day stays from the ED jumps substantially in the year following the acquisition. This difference between the one-day stays at newly-acquired hospitals before and after the acquisition is statistically significant (p-value ≤ 0.05), meaning that the difference is extremely unlikely to have been the result of chance.



137.    The same trend also is true at the former Triad hospitals across several common patient conditions. Under a standard two-tailed t-test, these differences also are statistically significant (p-value ≤ 0.05), meaning that they are extremely unlikely to have been the result of

chance.



138.    The same trend is true at all of CHS's acquired hospitals in the 2006-2009: the one-day stay numbers for chest pain, syncope and collapse, and GI-bleeding spiked in the year following CHS's acquisition, reflecting CHS's admission of patients from the ED who, prior to the acquisition, most likely would have been treated in observation.



**7.     CHS's Admissions Practices Result In At Least Hundreds Of Millions Of Dollars In Improper Billings**

139.     CHS has billed substantial excess sums by driving admissions upward.  Taking only CHS's highest volume and lowest acuity inpatient-admitted Medicare patients, CHS receives on average approximately $3,500 more per admitted patient than it would receive if these patients were treated in observation.

140.     CHS's efforts to inflate the admissions rate and decrease the observation rate at its hospitals have been remarkably profitable.  In the years 2006 to 2009, CHS provided inpatient care to approximately 51,000 to 65,000 Medicare patients and received between approximately $232 million and $306 million by admitting Medicare patients to the hospital who, under industry standard clinical criteria, likely would have been treated in observation.  And, in the years 2003 to 2009, CHS provided inpatient care to approximately 60,000 to 74,000 Medicare patients and received between approximately $271 million and $345 million by admitting Medicare patients to the hospital who, under industry standard clinical criteria, likely would have been treated in observation.  The net incremental revenue that CHS billed through this admissions practice is a significant, unsustainable, and improper source of revenue to CHS.

141.     But these improper revenues likely represent only a fraction of the total benefit that CHS has received through improper billings, since CHS's liberalized admission criteria have undoubtedly resulted in similarly improper billings to private payers and to state Medicaid programs.

## CHS:  THE SERIAL HOSPITAL ACQUIRER ALREADY
## UNDER GOVERNMENT SCRUTINY FOR ITS CONDUCT

142.    For over a decade, CHS has steadfastly adhered to an operational strategy of acquiring hospitals and increasing revenue from these hospitals by immediately lowering their observation rates and increasing inpatient admission rates through its wrongful practices.

143.    CHS's strategy of growth-through-acquisition is best illustrated through its 2007 acquisition of Plano, Texas-based Triad, which operated 49 hospitals in 17 states, including 11 hospitals in Texas.  After acquiring Triad, CHS eliminated 85% of the former Triad headquarters employees.  Immediately following the acquisition, the vast majority of the former Triad hospitals were forced to adopt CHS's non-standard Blue Book criteria—and reject the InterQual Criteria used by most Triad hospitals—for determining whether a patient should be admitted into the hospital or, instead, treated on an observation basis.  The immediate impact of CHS's Blue Book practices on Triad's hospitals was stunning:  within one year of the acquisition, the observation rate at the former Triad hospitals that had been incorporated into CHS dropped 52%, a direct result of CHS improperly admitting into hospitals patients who, under Triad's pre-acquisition admissions criteria, would have been appropriately treated on an observation basis.

144.    The problem for CHS, however, is that its admissions practices cannot continue because the DOJ and Medicare auditors have looked with increased scrutiny on hospitals with high one-day stays—which Medicare considers red flags for patients who could have been treated on an outpatient observation basis rather than admitted to the hospital.  For example, since 2007, the DOJ has announced at least four multi-million dollar settlements with hospitals over improper billing of observation patients as admissions.  This enhanced scrutiny of improper hospital billing also has been driven by CMS, which recently substantially expanded nationwide

the use of Recovery Audit Contractors or "RACs"—auditors who are paid a contingency fee to identify improper Medicare billings by hospitals.

145.    Prior to Tenet's filing its original Complaint in this action, CHS disclosed in SEC filings that its hospital in Laredo, Texas is being investigated by the OIG, which has requested documents related to matters including "case management, resource management, admission criteria, patient medical records, coding [and] billing…"  And in February 2011, CHS announced that each of its 18 Texas hospitals were under investigation by the Texas Attorney General concerning "emergency department procedures and billing."  However, CHS failed to disclose another, broader OIG investigation into "all of [CHS's] hospitals[']" use of Pro-MED, among other "emergency department processes and procedures," until after Tenet filed its original Complaint in this action.

146.    Then, on April 25, 2011, CHS disclosed that on April 22, 2011, the DOJ had filed a motion to stay the *qui tam* action styled *United States ex rel. and Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*.  According to the DOJ, this was in order to "allow the national investigation to continue and the United States to make a more informed intervention decision . . . ."  The DOJ informed the court that, although it had previously declined to intervene, "the United States [then] became aware of significant overlap between certain allegations made in the instant matter and those under investigation elsewhere in the United States.  Specifically, the United States is investigating allegations of improper billing for inpatient care at other hospitals associated with [CHS] . . . *asserted in other qui tam complaints in other jurisdictions*." (emphasis added).  The DOJ also stated that "the [DOJ], multiple United States Attorneys' offices, and the [OIG] are now closely coordinating their investigation of these overlapping allegations."  The DOJ further

referenced this litigation, stating that it "makes allegations against CHS that are related to Relator's allegations herein and what is now a nationwide investigation of CHS . . . and related entities."

147.    In substance, the *qui tam* complaint, which was first filed on January 7, 2009 and which has been unsealed for months, contains numerous allegations related to the ones herein, confirming that the purported "synergies" CHS "realized" through the Triad acquisition were based on improper admissions practices, including:  "Unwilling to lose the revenue [that the former Triad hospital had been reimbursing Medicare as part of a proactive audit], CHS began changing the case management of short stay cases, educating physicians and Case Managers to use 'inpatient' status rather than '23 hour observation' in direct opposition to the training given to physician's [*sic*] in earlier years.  CHS justified this by the use of questionable medical criteria they devised and different than that established by Medicare, *i.e.* Blue Book vs InterQual criteria."  The *qui tam* complaint further alleges that Bill McCray, the head of an entity called CHS Case Management, visited the former Triad hospital in January 2008 and informed the case managers that CHS had an intense focus on case management and that all hospital personnel would need to be educated on the Blue Book criteria.  The *qui tam* relator, a former Supervisor of Case Management at the former Triad Hospital, also stated under oath that she compared the Blue Book to InterQual and found it "*exceptionally simplistic* and *nonspecific*" and that it could be used to justify almost any hospital admission.

## CHS SETS ITS SIGHTS ON TENET
## AS ITS NEXT ACQUISITION TARGET

**A.    CHS Makes Its First Unsolicited, Inadequate Offer To Acquire Tenet**

148.    On November 12, 2010, Wayne Smith of CHS sent a letter to Tenet's President and Chief Executive Officer, Trevor Fetter, and the Tenet Board of Directors making an

unsolicited offer to acquire all of the outstanding shares of Tenet for $6.00 per share in cash and stock.  Smith indicated his belief that any such merger would present a "compelling strategic combination" based on, among other things, CHS's "ability to leverage the operating efficiencies and best practices of a combined organization."

## B.     After Careful Consideration, The Tenet Board Rejects CHS's Inadequate Bid

149.    Tenet's Board of Directors, in consultation with its financial and legal advisors, unanimously determined that CHS's proposal was not in the best interest of Tenet or its shareholders.

## C.     CHS Goes Public With Its Acquisition Proposal And Commences Its Proxy Solicitation Process

150.    On December 9, 2010, the day after receiving Tenet's rejection, CHS issued a press release, which it filed with the SEC as proxy solicitation materials,[20] announcing that it had made an offer to acquire Tenet for $6.00 per share in cash and stock, and that the Tenet Board of Directors had declined to accept that offer.  The press release stressed CHS's "reputation for superior operating performance" and "successful track record of integrating acquisitions."  CHS also stated in the press release that its proposal was "strategically compelling" because, among other things, the "operating efficiencies and best practices of a combined organization would enable it to provide even higher quality care for patients . . ."

---

[20] CHS filed the press release with the SEC pursuant to Rule 425 of the Securities Act of 1933. Materials filed under Rule 425 also are deemed filed as proxy solicitation materials under Rule 14a-12 of the Securities and Exchange Act of 1934.  In particular, Note 2 to Rule 425 under the Securities Act of 1933 states: "No filing is required under Rule 13e-4(c), Rule 14a-12(b), Rule 14d-2(b), or Rule 14d-9(a), if the communication is filed under this section. Communications filed under this section also are deemed filed under the other applicable sections."

With its press release, CHS also filed with the SEC a presentation entitled "Community Health Systems and Tenet Healthcare: A Compelling Opportunity for Value Creation," which outlined CHS's rationale for seeking to acquire Tenet.

151.    The following day, on December 10, 2010, CHS hosted an analyst call in which Wayne Smith made various statements about the proposed deal, including that there was "significant synergy potential" in a combined CHS-Tenet.

**D.    CHS Launches A Proxy Solicitation Contest To Replace Tenet's Board**

152.    On December 20, 2010 CHS issued a press release, which it filed with the SEC as proxy solicitation materials pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, announcing that CHS planned to nominate directors for election at the 2011 Tenet annual meeting.  The press release quoted Wayne Smith as stating that CHS was convinced of the "powerful logic" of the proposed acquisition and was "fully committed to completing" the acquisition.

153.    On January 12, 2011, CHS filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, a presentation delivered by Wayne Smith on January 11, 2011 at the JP Morgan Investor Conference in San Francisco, California (the "January 12th Proxy Solicitation").

154.    Two days later, on January 14, 2011, CHS issued a press release, which it filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, announcing a slate of ten directors that CHS said it intended to nominate to replace Tenet's ten-member Board at Tenet's November 3, 2011 annual meeting.

155.     On February 8, 2011, Wayne Smith delivered a presentation at the UBS Global Healthcare Services Conference, a portion of which remarks were filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934.

156.     On February 24, 2011, CHS issued a press release, which it filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, announcing its earnings for the fourth quarter of 2010. The following day, CHS hosted a teleconference with investment analysts to discuss CHS's quarterly earnings.  On February 28, 2011, CHS filed excerpts of the earnings call transcript with the SEC as proxy solicitation materials, again pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934.

157.     On March 1, 2011, CHS filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, a presentation delivered by Wayne Smith at the Citi Global Healthcare Conference, and excerpts of the remarks delivered by Smith at the conference.

158.     On March 2, 2011, CHS filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, excerpts of remarks by Wayne Smith and Larry Cash at the March 2, 2011 RBC Capital Markets Healthcare Conference.

**E.     Tenet Commences This Action, And CHS Responds By Disseminating More Misleading Proxy Solicitation Materials And Amending Its Offer**

159.     On April 11, 2011, Tenet filed its original Complaint for Violations of Federal Securities Laws in this action.

160.    That same day, CHS issued a press release, which it filed with the SEC as proxy solicitation materials, pursuant to Rule 425 of the Securities Act of 1933 and Rule 14a-12 of the Securities Exchange Act of 1934, responding to Tenet's original Complaint.  In its press release, CHS stated that:  "Tenet's allegations are completely without merit," "[p]roviding high-quality patient care is [CHS's] most important priority," "CHS conducts its business with the utmost integrity and adheres to the highest business practice standards," and "both Credit Suisse and Goldman Sachs have reaffirmed their confidence in financing the transaction."

161.    On April 18, 2011, CHS issued a press release, which it filed with the SEC as proxy solicitation materials, pursuant to Rule 14a-12 of the Securities Exchange Act of 1934, announcing that CHS submitted a proposal to Tenet's Board of Directors to acquire all of Tenet's outstanding shares for $6.00 per share in cash.  In its press release, CHS stated that one reason for modifying the offer was to "render[] Tenet's irresponsible and inaccurate lawsuit irrelevant."

**F.      CHS Belatedly Discloses That It Has Long Been Aware Of The Allegations In The Complaint And That The OIG Launched An Investigation Before Tenet's Complaint**

162.    Not only have Defendants failed to disclose core facts about CHS's business practices and strategy, but, in the aftermath of the filing of Tenet's original Complaint on April 11, 2011, Defendants' disclosure failures have become even more pronounced.  In each instance, Defendants kept hidden core information about shareholder and regulatory scrutiny relating to the very issues raised in Tenet's complaint.  Indeed, only after Tenet's lawsuit shined a light on CHS's improper admissions practices did CHS come clean about the extent to which these practices had been under investigation.

163.    On April 15, 2011, shortly after the markets closed for the week, CHS filed with the SEC a Form 8-K, disclosing as a Regulation FD Disclosure that, "[o]n Friday, April 8, 2011, [CHS] received a document subpoena, dated March 31, 2011, from the U.S. Department of Health and Human Services, Office of the Inspector General (the 'OIG'), in connection with an investigation of possible improper claims submitted to Medicare and Medicaid."  Specifically, CHS disclosed that:

> The subpoena . . . requests documents from all of our hospitals and appears to concern emergency department processes and procedures, including our hospitals' use of the Pro-MED Clinical Information System . . . .  The subpoena also requests other information about our relationships with emergency department physicians, including financial arrangements.  The subpoena's requests are very similar to those contained in the Civil Investigative Demands received by our Texas hospitals from the Office of the Attorney General of the State of Texas on November 15, 2010.

164.    By failing to promptly disclose its receipt of the OIG's subpoena, CHS knowingly and materially tainted the integrity of its communications relating to this litigation.  By delaying this disclosure until after the markets closed on Friday, April 15, moreover, CHS manipulated the market's reception and understanding of this litigation during the entirety of that first critical week—during which investors and investment analysts speculated whether the federal government would launch an investigation into CHS's admissions practices—so as to try to make CHS appear more credible and artificially buoy its stock price heading into the weekend.  And, but for this lawsuit, the OIG's subpoena would have remained presently undisclosed.

165.    Then, on April 18, 2011, one week after Tenet filed its original Complaint in this action, CHS filed with the SEC another Form 8-K, disclosing as another Regulation FD Disclosure that:

> On April 15, 2011, William Patterson, Executive Director of CtW Investment Group ("CtW"), sent a letter on behalf of CtW to [CHS].  Mr. Patterson had previously sent a letter dated September 28, 2010 on behalf of CtW to [CHS], to

which Rachel Seifert, Executive Vice President, Secretary and General Counsel of [CHS], had responded in a letter dated October 12, 2010 on behalf of [CHS] to CtW.

166.    The September 28, 2010 letter from CtW requested that CHS Board of Directors conduct an independent investigation into troubling admission practices at CHS hospitals, as described in the letter.  In particular, CtW's letter, which CHS included in its filing, pointed out that, in federal fiscal year 2008, "CHS generated approximately an additional $60 million, nearly 30% of net income for that year, from billing Medicare for 'one-day stays' and through higher than expected admissions from the emergency room.  Short stays are viewed as potential indicators of cases of inappropriate patient status assignment that result in higher reimbursement than observation stays and they often originate from the emergency department."  (footnote omitted).  Specifically, CtW's data showed that, in 2008, half of CHS's hospitals (excluding those that had been acquired by CHS for less than a year) placed in the 80th percentile or higher nationally with respect to the rate of one-day stays.  Another 25% of CHS's hospitals placed in the 60th to 80th percentile.  CtW concluded that:  "(1) Higher-than-average one-day rates are observed for patients admitted through the EDs of CHS hospitals; (2) These high rates appear to be a direct result of CHS' corporate strategy to increase ED admissions; and (3) In general, ED admissions greatly exceed expectations at CHS facilities and increasingly surpass these expectations as years accrue under CHS control."

167.    CHS did not disclose CtW's letter to the public *for over six months*, until one week after Tenet commenced this action, even though CtW's letter relates to the same underlying conduct at issue in this action, and even though CHS had issued a press release one week earlier characterizing Tenet's original Complaint as, among other things, "unfounded and irresponsible."  Just as with its belated April 15th disclosure about the OIG's subpoena, CHS

knowingly kept CtW's letter hidden from the investing public in a clear attempt to minimize the allegations about its admissions practices alleged in Tenet's complaint. CHS has yet to provide any substantive response to CtW's letter.

168.     Then, late on Friday, April 22, 2011, CHS filed with the SEC another Form 8-K, disclosing as another Regulation FD Disclosure that the DOJ had contacted CHS to inform it that the DOJ was reconsidering pursuing a *qui tam* action brought against a CHS subsidiary and a former Triad hospital. Months earlier, on December 27, 2010, the DOJ filed a notice that it had declined to intervene in the suit. According to CHS's disclosure, "[t]hat same day, an order was filed directing that the complaint be unsealed and served on the defendants by the relator. The suit has not been served on the defendants and the Company was not notified of these orders." CHS also stated that it "had cooperated fully with the government in its investigation of this matter, but had been unaware of the exact nature of the allegations in the complaint."

169.     And on April 25, 2011, again after the market had closed, CHS disclosed that the DOJ had filed a motion in the Indiana *qui tam* action. According to CHS's disclosure:

> [T]he Department of Justice has now "consolidated its investigations" of [CHS] and other related entities and that "the Civil Division of the Department of Justice, multiple United States Attorneys' offices, and the Office of Inspector General for the Department of Health and Human Services (HHS) are now closely coordinating their investigation of these overlapping allegations. The Attorney General of Texas has initiated an investigation; the United States intends to work cooperatively with Texas and any other States investigating these allegations." The motion also states that the Office of Audit Services for the Office of Investigations for HHS has been engaged to conduct a national audit of certain of the Company's Medicare claims. The government confirmed that it considers the allegations made in the complaint styled *Tenet Healthcare Corporation vs. Community Health Systems, Inc., et al*. filed in the United States District Court for the Northern District of Texas, Dallas Division on April 11, 2011 to be related to the allegations in the *qui tam* and to what the government is now describing as a consolidated investigation.

**G.     CHS Responds To Allegations Of Improper Admission Practices, Presents A Final Offer To Tenet, Which Tenet's Board, After Careful Consideration, Does Not Accept**

170.     On April 28, 2011, CHS hosted an investor call to discuss allegations that had been raised by Tenet, CHS shareholders, regulators, and whistleblowers about CHS's admission practices.  CHS filed its presentation and a partial transcript of remarks delivered by Smith and Cash with the SEC as proxy solicitation materials, pursuant to Rule 14a-12 of the Securities Exchange Act of 1934.

171.     On May 2, 2011, CHS issued a press release in which it indicated that it had raised its offer to acquire Tenet to $7.25 per share in cash, which CHS described as its best and final offer.  The press release quoted a letter sent by Smith to the Tenet Board of Directors in which Smith stated that "[i]t is time to move beyond lawsuits and rhetoric," and that if the Tenet Board did not respond by May 9, 2011 that it was interested in good faith negotiations with CHS, CHS would abandon its proposal and remove its director nominees.

172.     On May 9, 2011, Tenet issued a press release stating that Tenet's Board of Directors, after consulting with its independent financial and legal advisors, had unanimously determined that the $7.25 per share proposal from CHS grossly undervalued Tenet and was not in the best interest of Tenet or its shareholders.  Tenet announced that it would not enter into discussions with CHS based on many factors, including its grossly inadequate offer.

173.     On May 9, 2011, CHS issued a press release that indicating that it had withdrawn its offer to acquire Tenet and withdrawn its nominees for election to Tenet's Board.

<u>**CHS'S POTENTIAL VIOLATION OF THE SEC REGULATION REQUIRING FAIR DISCLOSURE**</u>

174.     In the aftermath of Tenet's lawsuit, CHS not only made untimely disclosures concerning shareholder queries and regulatory investigations.  CHS also engaged in a series of

communications in violation of Regulation FD.  Regulation FD provides that "[w]henever an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities to [one group of investors], the issuer shall make public disclosure of that information . . . [s]imultaneously, in the case of an intentional disclosure; and . . . [p]romptly, in the case of a non-intentional disclosure."  17 C.F.R. § 243.100(a).  In short, Regulation FD requires that issuers immediately make fair disclosure to the public of any material information that it has intentionally disclosed to only a select group.

175.    CHS, however, did not made public disclosure—much less "simultaneously"—of an actual copy of the investigative subpoena from the Texas Attorney General, even though CHS intentionally provided it to a healthcare law specialist who was then featured on an investor call on April 19, 2011.  On the call, the featured speaker stated not only that he had seen copies of the investigative subpoena, but also that he had spoken with CHS about it.  CHS's selective disclosure in this regard violates Regulation FD.

176.    On information and belief, CHS also intentionally assembled a group of 25 investors and one analyst to CHS's offices on April 13, 2011, to share materially non-public information relating to, among other topics, CHS's view on this litigation.  CHS did not disclose this information to the public at large, in violation of Regulation FD.

177.    Further, CHS, in violation of Regulation FD, failed to make fair disclosure of the numerous private conversations between CHS management and select investors and investment analysts in which CHS management shared material nonpublic information regarding the issues raised in this litigation.  For example:

- A Susquehanna analyst report dated April 13, 2011 refers to "a quick check with [CHS] management yesterday afternoon," during which the analyst learned detailed, material

information about CHS's operations relating to Tenet's allegations in this action. Specifically, CHS management purportedly shared figures relating to one-day stays and represented that "there are no arrangements provided by [CHS] that would create a financial incentive for physicians to admit patients to [CHS] facilities."

- A Susquehanna analyst report dated April 12, 2011 refers several times to a "conversation last night" with CHS. Specifically, CHS management provided "an alternative case that could be consistent with the lower level of observations combined with normal inpatient admissions being in line with its industry peers."

- A Wells Fargo analyst report dated April 11, 2011 refers to "key takeaways"—learned directly from a conversation "[l]ate Monday afternoon" the analyst had with Larry Cash, convened when "management reached out to a number of investors and sell-side analysts"—about (i) CHS's planned conversion away from the Blue Book and (ii) CHS's ED admission rate.

- Private, one-off conversations also were referenced in the Oppenheimer analyst report dated April 13, 2011 and the UBS analyst report dated April 13, 2011.

- These and other analyst reports observe that CHS management shared preliminary thoughts on this litigation with select investors and analysts, before sharing the same information with the market generally. For example, Susquehanna's April 12th report states: "[CHS] offered some preliminary thoughts in a conversation last night and promised to provide a more complete rebuttal within the next week."

178.    These private conversations with specific analysts and investors during which CHS intentionally disclosed material nonpublic information—without simultaneous disclosure *by CHS* to the public—violated Regulation FD. Moreover, in light of CHS's proxy solicitation,

any scripts, summaries of calls with analysts, or any similar documents should have been—but were not—filed with the SEC as proxy solicitation materials.

<div align="center">

**MATERIAL MISSTATEMENTS AND OMISSIONS
IN CHS'S PROXY SOLICITATION MATERIALS**

</div>

**A.   CHS's December 9th Press Release And Presentation Filed With The SEC Contained Numerous Material Misstatements And Omissions**

179.   On December 9, 2010, CHS filed with the SEC a press release announcing its original cash-and-stock proposal to acquire Tenet.  In the press release, which was filed with the SEC, CHS stated, among other things, that the combination of CHS and Tenet was both "financially and strategically compelling" because Tenet would be accretive to CHS's earning per share in the first full year after closing.  In addition, the press release stated that CHS had a "reputation for superior operating performance and a successful track record of integrating acquisitions."  CHS also stated that its "ability to enhance the operating efficiencies and best practices of a combined organization would enable it to provide even higher quality for patients . . . ."

180.   CHS attached as an exhibit to its press release a copy of a presentation entitled "Community Health Systems and Tenet Healthcare: A Compelling Opportunity For Value Creation."[21]  In that presentation, CHS made several of the same statements contained in its press release.  The presentation contained additional statements about the purported value of a combined CHS-Tenet, including "significant synergy potential" between CHS and Tenet.  CHS also stated that the "Transaction Benefits Key Constituents," including patients, who would experience "[i]mproved quality of care from standardized best practices and clinical protocols,"

---

[21]  In this filing, CHS acknowledged that "The Company and its directors and executive officers and other persons may be deemed to be participants in any solicitation of proxies from Tenet's stockholders in respect of the proposed transaction with Tenet . . ."

and payers/employers, who would receive a "[c]omprehensive range of healthcare services provided in a cost-efficient manner."  With respect to the Triad acquisition, CHS stated that it had improved Triad's margins and achieved "peak synergies" of over $275 million.

181.    These statements were materially false and/or misleading in light of CHS's failure to disclose that, for at least a decade, the number of patients admitted into CHS hospitals was the product of CHS's improper admissions practices, discussed in detail above, to steer patients into inpatient treatment despite the absence of any clinical basis for these patients to be admitted into the hospital, which has resulted in various regulatory investigations and the potential for significant liability to CHS.  Specifically, CHS failed to disclose that CHS had engaged in an effort to increase its patient admissions through implementation of the improper admission practices that resulted in the admission of patients into CHS hospitals who, under industry standard clinical criteria, should have been treated in observation.  CHS's purported reputation as a successful operator and acquirer was based on this same improper conduct.

182.    Moreover, CHS's statement that a combined CHS-Tenet would provide even higher quality healthcare for patients was false and misleading in light of these same material omissions about CHS's admissions practices.  In fact, a combined CHS-Tenet would have provided worse healthcare because, if CHS had successfully implemented its Blue Book, financial incentive, one-day stay, Pro-MED, and other practices at Tenet, just as CHS had done with the former Triad hospitals, even more patients would have been improperly admitted into hospitals for unnecessary treatment, exposing Medicare and other payers to improper additional costs.

183.    These statements also were materially false and/or misleading in light of CHS's failure to disclose that its results after acquiring Triad were driven by CHS's implementation of

its admissions practices at former Triad hospitals, discussed in detail above, to steer patients into inpatient treatment despite the absence of any clinical basis for these patients to be admitted into the hospital.

184.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

185.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**B.    CHS And Defendants Smith And Cash Made Numerous Material Misstatements And Omissions During The December 10th Analyst Call**

186.    On December 10, 2010, CHS hosted an analyst call in which Defendants Smith and Cash made many of the same misstatements about the proposed deal as contained in CHS's press release and investor presentation filed with the SEC on December 9, 2010.  In addition, Smith touted CHS's "proven track record of unmatched operating performance," including through CHS's acquisition of Triad, which CHS "successfully integrated."  In particular, Smith claimed that CHS was able to effectively integrate Triad because "we have a very standardized, centralized platform, operating platform.  And the more we add to the platform, the more productivity and the more efficiency we get."  Smith asserted that these same "corporate synergies and operating synergies" would occur in any Tenet acquisition.  Cash, referencing CHS's purported success with the Triad acquisition, stated that "$275 million [in synergies] can probably be achieved" in any acquisition of Tenet.  Moreover, Smith stated that "[p]rior to the execution of a definitive agreement, we will receive a financing commitment to fully fund this transaction."

187.     These statements were materially false and/or misleading in light of the same material omissions concerning CHS's admissions practices set forth above.  In particular, Defendants failed to disclose the improper admission practices, the decreased rate of observation, and the increase in one-day stays at the Triad hospitals in the year following the acquisition.  In addition, these statements were materially false and misleading because Defendants failed to disclose that CHS faced substantial potential liability due to its undisclosed admissions practices and regulatory investigations related thereto, which put CHS's ability to consummate the proposed transaction at risk.

188.     Smith's statement that CHS would be able to raise sufficient funds to finance the transaction also was false and misleading.  Given the magnitude of CHS's undisclosed business practices and liabilities, the ongoing regulatory investigations, and the fact that CHS already is the highest leveraged publicly traded hospital system, CHS was unlikely to be able to consummate the transaction once the truth concerning CHS's admissions practices came to light.

189.     These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

190.     Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**C.     CHS's December 20th Press Release Contained Numerous Material Misstatements And Omissions**

191.     On December 20, 2010, CHS issued a press release, which it filed with the SEC, announcing that it intended to nominate directors for election at Tenet's 2011 annual meeting. The press release quoted Wayne Smith as saying that CHS was convinced of the "powerful logic

of combining CHS and Tenet," and that any such combination was "strategically and financially compelling."

192.     These statements were materially false and/or misleading in light of CHS's material omissions concerning its Blue Book and other admissions practices discussed in detail above.

193.     These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

194.     Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**D.     CHS's January 12th Solicitation And Statements By Smith During The Investor Conference Were Materially False And Misleading**

195.     On January 12, 2011, CHS filed with the SEC,[22] a complete copy of the presentation delivered by defendant Wayne Smith at the JP Morgan Investor Conference on January 11, 2011.  It contained numerous materially false and misleading statements and omissions, as set forth below.

**1.     Statements About CHS's Admissions Growth, ER Strategy, and Operating Strategy**

196.     In the January 12th Proxy Solicitation, CHS stated that it is an "Industry Leader in Admissions Growth," and provided data purporting to reflect that CHS's admissions and adjusted patient admissions had grown in every year from 2000 to 2009.  In addition, CHS stated that one of its "Significant Opportunities for Growth in Revenue and Operating Profit" is to

---

[22]  This filing, according to CHS, was "deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934."

"Increase Inpatient ER Visits."  CHS further stated that its "ER Strategy" has "[c]ontributed to same store admission growth."  Moreover, with regard to its operating strategy, CHS made statements about its purported success at "Improv[ing] Hospital Operations" through "Standardization and Centralization," including CHS's "Billing and Collections" and "Quality/Resource/Case Management" functions.  During Wayne Smith's January 11, 2011 presentation, moreover, Smith stated that CHS had a "very sound operating strategy," a "very clear executable strategy, [that] is predictable, [and] is sustainable, as we've proven over the last ten years," and a "proven operating formula and strategy that works with consistent financial performance and margin improvement."

197.   These statements were materially false and/or misleading in light of CHS's failure to disclose that its admissions numbers, ER strategy, and operating strategy depended on CHS's improper admissions practices, discussed in detail above.  In particular, for at least a decade, the number of patients admitted into CHS hospitals was the product of CHS's improper admissions practice of steering patients into inpatient treatment despite the absence of any clinical basis for these patients to be admitted into the hospital.  Specifically, CHS failed to disclose that CHS had engaged in a systemic practice of increasing its patient admissions through implementation of the Blue Book criteria that resulted in the admission of patients into CHS hospitals who, under industry standard clinical criteria, should have been treated in observation.  CHS also failed to disclose the substantial liability it faces from these admissions practices and from the ongoing regulatory investigations related thereto, which put CHS's ability to finance its proposed transaction with Tenet at risk.

198.     These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

199.     Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

### 2.     False and Misleading Statements And Omissions About CHS's Acquisition of Triad

200.     During Wayne Smith's January 11, 2011 presentation at the JP Morgan Investor Conference, Smith made affirmative statements about CHS's success as an acquirer of hospitals, and in particular, CHS's purported success in acquiring and integrating hospitals acquired in from Triad in 2007.  In particular, Smith stated:

> We get a lot of questions around synergies and about all we can tell you is—and this is what we always tell you is what we have done in the past and how we performed.  But if you look at what happened, the Triad facilities, we've improved the margin about 280 basis points and we got about $275 million of synergies out of those facilities.

201.     In addition, in the January 12th Proxy Solicitation, CHS provided data that purported to show, on a revenue and EBITDA basis, that hospitals acquired by CHS performed better after being acquired by CHS.  CHS further stated in the January 12th Proxy Solicitation that "CHS Management Significantly Improved Triad's Operating Results," and that CHS had "[s]uccessfully integrated [the] Triad acquisition."  In particular, as Smith indicated during his presentation, the proxy statement claimed that CHS had improved Triad's margins by 280 basis points in the two years following the acquisition, and that CHS had achieved over $275 million in "Peak Synergies" from the Triad acquisition.

202.     These statements were materially false and/or misleading in light of CHS's failure to disclose that its results after acquiring Triad were driven by CHS implementing its admissions

practices at former Triad hospitals, discussed in detail above, to steer patients into inpatient treatment despite the absence of a clinical basis for these patients to be admitted into the hospital.

203. These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

204. Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

### 3.     Statements About The Value Of CHS's Proposal To Acquire Tenet

205. During Wayne Smith's January 11, 2011 presentation, he also stated that "there is a clear opportunity both in margin improvement and there is clear opportunity for synergies in this acquisition going forward."

206. This statement was materially false and/or misleading in light of CHS's failure to disclose its Blue Book and other admissions practices, discussed in detail above, and that these admission practices were a core component of any purported "synergies."

207. These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

208. Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

### 4.     Statements About CHS's Financial Results

209. In the January 12th Proxy Solicitation, CHS made statements concerning CHS's financial performance, including CHS's revenue, EBITDA, EBITDA margin, and earnings per share, among other metrics. CHS also stated that "Community Health's Strategy Has Delivered

Results," and included a chart that purported to show CHS's revenue and EBITDA increasing nearly every year between 1996 and 2009.

210.    These statements were materially false and/or misleading in light of CHS's failure to disclose its Blue Book and other admissions practices, discussed in detail above.  Between 2003 and 2009, these practices have netted CHS hundreds of millions of dollars in billings related to improperly admitted Medicare patients, and likely resulted in substantial additional revenues from similarly improper billings to insurance companies, states, and other payers, and have created the potential for enormous undisclosed fines and penalties and the risk of exclusion from the Medicare program.  These statements also were materially false and/or misleading in light of CHS's failure to disclose the substantial liabilities resulting from these improper practices, which put CHS's ability to finance its proposed transaction with Tenet at risk.

211.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

212.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**E.    CHS's February 8th Proxy Solicitation, Including Statements By Smith, Contained Numerous Material Misstatements And Omissions**

213.    On February 8, 2011, Wayne Smith delivered a presentation at the UBS Global Healthcare Services Conference.  That same day, CHS filed excerpts of Wayne Smith's remarks at the UBS conference with the SEC.  These materials contained numerous materially false and misleading statements, similar to those contained in early proxy solicitation materials from CHS.  For example, in the February 8th proxy solicitation materials, Wayne Smith touted CHS's ability to improve margins and performance in its acquired hospitals, citing the Triad acquisition as the

primary example.  Smith also referred to the supposed "synergies" CHS achieved in the Triad acquisition and asserted that, with respect to Tenet, there "is a lot of opportunity in terms of the synergies."

214.    These statements were materially false and/or misleading in light of CHS's failure to disclose that its results after acquiring Triad were driven by CHS implementing its admissions practices at former Triad hospitals, discussed in detail above, to steer patients into inpatient treatment despite the absence of a clinical basis for these patients to be admitted into the hospital, and that any synergies CHS would have realized from an acquisition of Tenet would have depended on CHS implementing the same admissions practices.

215.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

216.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**F.     CHS's February 24th Press Release And Statements By Smith And Cash During The Earnings Call Were Materially False And Misleading And Contained Numerous Material Omissions**

217.    On February 24, 2011, CHS issued an earnings release that it filed with the SEC. The following day, CHS hosted an earnings call with investment analysts.  The earnings release and statements made by Wayne Smith and Larry Cash during the earnings call were materially false and misleading in light of many of the material omissions discussed in detail above.

218.    For example, during the analyst call, Smith and Cash also made materially false and misleading statements about patient admissions and observation status.  Specifically, Smith stated that there was a "national trend" of moving patients who had been billed as inpatients to

observation, due to increased pressure from payers to "reduce costs."  Smith stated that, for some insurance companies, "the payment on observation is essentially the same as when [patients] stay [in the hospital].  So the economics on it sometimes are not all that different."  Smith further stated that the movement of patients billed as admitted to observation is "an industry-wide issue and I don't see it as anything that's problematic for us.  It's just a change in location basically."

219.    These statements were materially false and misleading in light of Defendants' failure to disclose that CHS was far more vulnerable than its peers to pressure from payers to shift admitted patients to observation status in light of undisclosed CHS's admissions practices, which resulted in CHS vastly underutilizing observation status as compared to CHS's peer hospital operators.  These statements also were materially false and misleading because, contrary to Smith's statements and suggestion that there was little difference in cost to the payer between billing a patient as inpatient and billing the same patient as observation and that the difference between an admission and observation is merely a difference of "location," the difference for CHS of billing a patient as an admitted inpatient and billing a patient in observation is substantial.  CHS earns an average of approximately $3,500 more per patient for CHS's highest volume and lowest acuity admitted Medicare patients than CHS would earn if these patients had been treated in observation, and for many patients, the spread is far higher.  These statements are also materially false and misleading because of Smith's failure to disclose the very material risk of improper billing under Medicare, in particular, that under Medicare there is an enormous difference in payments between observation and inpatient status, and that the penalties for improperly billing Medicare include treble damages and a penalty of up to $11,000 per false claim, plus the risk of exclusion from the Medicare program.  And, again, these statements were materially false and misleading because Smith failed to disclose the substantial liability CHS

faces as a result of these improper practices, which put CHS's ability to finance its proposed transaction with Tenet at risk.

220.    Smith also made statements during the earnings call concerning CHS's "success as an operator and consolidator in the industry," that CHS had "continued to focus on improving performance at the individual hospital level in all of our markets, especially at our most recently acquired facilities," and that CHS had "proven operational efficiencies." These statements were materially false and misleading in light of CHS's failure to disclose that its success as an acquirer, its operational performance and its "efficiencies" were dependent upon its undisclosed and unsustainable admissions practices discussed in detail above.

221.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

222.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

### G.   CHS's March 1st Proxy Solicitation Contained Materially False And Misleading Statements

223.    On March 1, 2011, Wayne Smith delivered a presentation at the Citi Global Healthcare Conference. That same day, CHS filed with the SEC a copy of the presentation and excerpts of Wayne Smith's remarks at the conference. These materials contained numerous materially false and misleading statements, similar to those contained in early proxy solicitation materials from CHS. Indeed, the presentation was virtually identical to the presentation delivered by Wayne Smith at the JP Morgan Investor Conference on January 11, 2011, which CHS filed with the SEC as proxy solicitation materials, and therefore contains all of the same materially false and misleading statements and omissions as the January 11th proxy solicitation,

discussed in detail above.  In addition, during his remarks at the Citi Global Healthcare Conference, Wayne Smith touted CHS's ability to improve margins and performance in its acquired hospitals, citing the Triad acquisition as the primary example.

224.   These statements were materially false and/or misleading in light of Defendants' failure to disclose that its results after acquiring Triad were driven by CHS implementing its admissions practices at former Triad hospitals, discussed in detail above.  They also were false and misleading in light of Smith's failure to disclose the substantial liability CHS faced as a result of these improper practices and the regulatory investigations related thereto, which put CHS's ability to finance its proposed transaction with Tenet at risk.

225.   These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

226.   Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

## H.   CHS's March 2nd Proxy Solicitation Contained Materially False And Misleading Statements And Material Omissions

227.   On March 2, 2011, Wayne Smith and Larry Cash spoke at the RBC Capital Markets Healthcare Conference.  That same day, CHS filed with the SEC excerpts of Smith's and Cash's remarks at the conference.  During the conference, Smith and Cash made several of the same materially false and misleading statements as had been made in previous proxy solicitations by Defendants.  Specifically, Smith and Cash touted the CHS's ability to improve margins and performance in its acquired hospitals, citing the supposed "synergies" that CHS realized through the Triad acquisition as the primary example, and asserting that CHS would realize similar synergies by acquiring Tenet.

228.    These statements were materially false and/or misleading in light of Defendants'

failure to disclose that its results after acquiring Triad were driven by CHS implementing its

admissions practices at former Triad hospitals, discussed in detail above, and that CHS's ability

to realize similar synergies by acquiring Tenet depended on its ability to implement the same

improper admissions practices.  These statements also were materially false and/or misleading in

light of the failure to disclose the substantial liability faced by CHS as a result of the improper

admission practices at its hospitals and from the regulatory investigations into these practices.

229.    These material false and misleading statements and omissions by CHS, Smith,

and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses,

to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

230.    Defendants' materially false and misleading statements discussed above constitute

a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

## I.    CHS's April 11th Proxy Solicitation Contained Materially False And Misleading Statements And Material Omissions

231.    On April 11, 2011, the same day Tenet commenced this action, CHS filed with

the SEC a proxy solicitation in which it stated that Tenet's lawsuit was, among other things,

"baseless," "completely without merit," "unfounded and irresponsible," and "self-serving."

232.    These statements were materially false and/or misleading in light of Defendants'

failure to disclose, prior to or at that time, that it had received, at least as of April 8, 2011, a

subpoena from the OIG investigating issues that appear to be related to substantially the same

underlying misconduct as alleged in the original Complaint, namely, "possible improper claims

submitted to Medicare and Medicaid," "emergency department processes and procedures," and

"relationships with emergency department physicians, including financial arrangements."

233.    These statements were also materially false and/or misleading in light of Defendants' failure to disclose, prior to or at that time, that it had received a letter, dated September 28, 2010, from CtW, raising additional issues that appear to be related to substantially the same underlying misconduct as alleged in the original Complaint, including "the risks to future earnings and potential liabilities created by [CHS's] billing of the Medicare program, which we view as aggressive and unsustainable," and "[h]igher-than-average one-day rates are observed for patients admitted through the EDs of CHS hospitals."

234.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

235.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**J.    CHS's April 22nd Regulation FD Disclosure Contained Materially False And Misleading Statements And Material Omissions.**

236.    In its end-of-week, late afternoon disclosure on April 22, 2011 about the over-two-year-old *qui tam* action, CHS stated that the complaint was unsealed on December 27, 2010, but that it "has not been served on the defendants" by the relator.  Notably, CHS makes no mention of when it first saw the complaint in that action.  Indeed, given that public companies like CHS routinely track the filing and unsealing of complaints against them in federal and state courts, there can be little doubt that CHS was fully aware of the existence and allegations of the *qui tam* complaint well before CHS chose to disclose the lawsuit the evening of April 22nd.

237.    Moreover, CHS's disclosures that "[t]he relator had worked in the case management department of Lutheran Hospital of Indiana but was reassigned to another department in the fall of 2006" and that "[t]his facility was acquired by the Company as part of

the July 25, 2007 merger transaction with Triad Hospitals, Inc." are false and misleading because they give the impression that the relator's allegations relate only to activities prior to CHS's acquisition of Lutheran.  To the contrary, the relator alleged under oath that she "worked for Lutheran from 1985 to October 1, 2008."  Thus, the relator was still working at Lutheran two years after "the fall of 2006" and observed first-hand how CHS changed what had been Triad's operating practices.

238.    CHS's disclosure that "[t]he suit . . . alleges that Lutheran Hospital of Indiana billed the Medicare program for (a) false 23 hour observation after outpatient surgeries and procedures, and (b) intentional assignment of inpatient status to one-day stays for cases that do not meet Medicare criteria for inpatient intensity of service or severity of illness" is further materially false and misleading because it improperly suggests that the litigation concerns wrongful conduct by the former Triad hospital.  To the contrary, the qui tam complaint makes clear that it is alleging that CHS—through the Blue Book and related enforcement mechanisms—dictated wrongful conduct.  Nor did CHS disclose the material fact that, if Lutheran is found to have engaged in Medicare fraud, CHS may have to sell the hospital or face the risk of exclusion from the Medicare program.

239.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

240.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

**K.     CHS's April 28th Proxy Solicitation Materials Contained Materially False
And Misleading Statements And Material Omissions.**

241.    On April 28, 2011, CHS hosted an investor call in which Smith and Cash sought

to address Tenet's allegations in this action concerning CHS's abnormal admission practices.

During that teleconference, Defendants Smith and Cash, on behalf of themselves and CHS, made

a series of materially false and misleading statements about CHS and its business practices.

242.    Critically, CHS filed its 109-page investor presentation, along with a partial

transcript of remarks delivered by Smith and Cash, with the SEC as proxy solicitation materials

pursuant to Rule 14a-12 of the Securities Exchange Act of 1934, noting that the communications

"relate[] to a business combination transaction with Tenet proposed by Community Health

Systems, Inc., CHS our [*sic*] the Company, which may become the subject of a registration

statement filed with the SEC."  In other words, CHS admits that all of the contents of its proxy

solicitation materials were material to Tenet's shareholders in connection with their decision

about whether to elect the CHS-nominated slate of directors at Tenet's next annual meeting.

These materials address, in particular, CHS's Blue Book, its admission practices, its utilization

of observation status, the reputation of CHS and its management team, the potential liability that

CHS faces as a result of its challenged practices, and CHS's annual revenue and financial

statements.

243.    During the April 28th investor call, CHS, Smith and Cash made a series of

materially false and misleading statements.  Among others, Defendants falsely suggested that the

Blue Book contained admissions criteria similar to InterQual when, in fact, the versions of the

Blue Book in place during the period identified in the complaint contained deficient criteria that

inappropriately justified the admission of patients to CHS hospitals despite no medical need for

inpatient treatment.  Similarly, it was materially false and/or misleading for Defendants to state

that it was a goal of the Blue Book for it to be "based on current clinical practice," when, in reality, during at least 2006-2009, many critical components of the Blue Book were inconsistent with accepted clinical practice.

244.    With respect to Pro-MED, the April 28th proxy solicitation materials contained false or misleading statements, including that Pro-MED "possibly reduces the need for use of observation status."  To the contrary, on information and belief, through its use of quality flags that were monitored by CHS hospitals, the use of Pro-MED made it far more likely that physicians at CHS hospitals would admit patients to the hospital, rather than treat them in observation status.  The presentation was further false and/or misleading when it suggested that the use of quality flags only occurred at four CHS hospitals.  On information and belief, the use of quality flags was widespread at CHS hospitals.  In CHS's region 4, for example, many more than four hospitals utilized quality flags throughout 2009, and, on information and belief, hospitals throughout CHS's other regions also utilized quality flags to increase patient admissions.

245.    The April 28th presentation contained further false and/or misleading statements concerning CHS's role in influencing patient admissions.  The presentation states that "CHS and its affiliated hospitals do not dictate admission decisions by physicians."  That statement was false and/or misleading because of the material omission that CHS had developed a corporate practice—through the Blue Book, Pro-MED, incentive compensation for increasing admissions, and other tools—to influence physicians at CHS hospitals to admit patients to the hospital despite no medical need for inpatient treatment.  Indeed, at some CHS hospitals, hospital CEOs, such as William Blanchard at De-Tar Hospital, personally influenced physicians to admit

patients who had been placed in observation status so that the hospitals would earn higher revenue from such patients.

246.    CHS also made false and misleading statements in its April 28th presentation concerning the Triad acquisition.  Defendants stated during that presentation that the Triad's substantially lower observation rate in the year immediately following CHS's acquisition resulted from, among other things, coding changes and lower 48 hour+ stays in observation. These statements were materially false and misleading.  In fact, Triad's substantially lower observation rate resulted from CHS imposing the Blue Book and other admission-focused policies on the former Triad hospitals, which resulted in these hospitals admitting patients who, under accepted clinical practice, should have been treated in observation.

247.    These material false and misleading statements and omissions by CHS, Smith, and Cash were part of a continuous plan to encourage Tenet shareholders, under false pretenses, to elect the CHS slate of directors at Tenet's next annual meeting on November 3, 2011.

248.    Defendants' materially false and misleading statements discussed above constitute a violation of Section 14(a) of the Exchange Act and Rule 14a-9.

## DEFENDANTS WERE AT LEAST NEGLIGENT IN MAKING AND DISSEMINATING THEIR FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS

249.    Defendants knew or reasonably should have known that the foregoing statements and documents they disseminated were materially false and/or misleading.  Each of the Defendants made the statements as part of a plan to induce Tenet shareholders, under false pretenses, to vote for CHS's slate of directors at Tenet's next annual meeting.  Defendants Smith and Cash, as senior executives of CHS, also had actual knowledge of CHS's improper

admissions criteria for years.  Smith and Cash also signed and approved the issuance and

dissemination of all of CHS's filings containing misstatements and/or omissions of material fact.

250.    Specifically, Defendants Smith and Cash both made public statements confirming

their awareness of the key facts alleged in this Amended Complaint.  For example, during the

February 25, 2011 analyst call, Smith stated that there was a "national trend" of moving patients

who had been billed as inpatients to observation, due to increased pressure from payers to

"reduce costs."  He then declared that the trend toward observation status was "an industry-wide

issue and I don't see it as anything that's problematic for us.  It's just a change in location

basically."  Thus, Smith's own statements demonstrate his knowledge that hospitals'

underutilization of observation (and improper admission of patients who should have been

treated in observation) had come under scrutiny from payers and regulators, yet he knowingly

failed to disclose that CHS had a corporate policy against placing patients in observation status,

and, instead, a policy of admitting would-be observation patients to the hospital.  Moreover,

Smith knew, or was negligent in not knowing, that his strategy had been successful, and as a

result, CHS's use of observation across its hospitals lagged far behind peer hospital systems and

the industry in general.

251.    Moreover, on April 28, 2011, Smith and Cash disclosed that CHS had recently

decided to move from the Blue Book to InterQual, which Smith described as having been the

result of discussions with managed care companies.  Cash identified discussions with one

managed care company "in one of the states in the South" that had pushed for CHS to adopt

InterQual.  Cash also noted that, as a result of CHS moving from the Blue Book to InterQual,

"we're seeing some [financial] effect now."  These statements demonstrate that Smith and Cash

both knew, or were negligent in not knowing, that there was a material revenue differential for a

hospital between treating a patient as an admitted inpatient and treating the patient in observation status.

252.    Defendants also made numerous public statements extolling the revenue-generating capabilities of Pro-MED.  For example, Smith said during the January 11th investor conference, which CHS filed as proxy solicitation materials the next day, that "[w]e have a system called ProMed that tells us everything demographically and clinically that we need to know about [ED] patients."  Previously, during CHS's Q3 2008 Earnings Call, Smith boasted: "We now have Pro-MED installed at all of our facilities other than maybe three or so. . . .  So we're getting the benefit for that if you recall, there's a couple points spread in terms of our admission rate versus Triad's admission rate through their emergency services."  Smith thus admitted his knowledge that CHS was using Pro-MED to close the spread between CHS's and Triad's ED admission rates.  Then, during CHS's Q4 2008 Earnings Call, Smith also highlighted Pro-MED as helping CHS achieve the following: "55, 60% of our admissions come through our emergency room" and that Pro-MED had led to "margin improvement" at Triad.  And, during CHS's Q1 2009 Earnings Call, Smith stated:  "[O]ne of the things that we were able to accomplish relatively quickly, within the first 12 months of the Triad acquisition, implemented our Pro-MED system."  He even admitted that "we've gotten a little bump in terms of our ER admissions because by focusing on that, in terms of the Triad hospitals.  We have our own system in terms of the way that we look at pricing and our emergency services."  Thus, Smith was fully aware of Pro-MED's role in boosting admissions rates at CHS hospitals, particularly following their absorption of the Triad hospitals—often against the clinical judgment of ED physicians—when he stated as part of his efforts to woo Tenet's shareholders, among other things, that CHS had a "very sound operating strategy," a "very clear executable strategy, [that]

is predictable, [and] is sustainable, as we've proven over the last ten years," and a "proven operating formula and strategy that works with consistent financial performance and margin improvement."  Smith's knowledge about Pro-MED's function also shows that he knew or recklessly disregarded the misleading nature of his statement, also made part of CHS's January 12, 2011 Proxy Solicitation, that CHS's "ER Strategy" has "[c]ontributed to same store admission growth."

253.    Further, Defendants Smith and Cash knew or negligently disregarded that CHS engaged in improperly aggressive admissions practices leading to an abundance of one-day stays, not only because of CtW's September 2010 letter, but also because, even earlier, during CHS's Q2 2008 Earnings Call, Defendant Cash stated:  "[O]ne thing's happened as we had pretty good growth with ER admissions which generally are a little bit less acuity business.  So while we've got very good admissions growth, it is a little bit less acuity."  Smith even stated: "One of the things that's maybe driving some of our volume is that we've had an -- we've been working hard on these emergency rooms, and increased our emergency room admissions of over 3%, and we are getting a little less acuity in terms of those, and that would be expected when you start really pushing them and working to improve your emergency services."  Thus, Defendants essentially conceded that CHS was driving up its admission rates for lower acuity patients— precisely those patients who are likely to be discharged in a day and in many instances should not have been admitted as inpatients in the first place.  Moreover, Defendant Cash announced, during each of the last six quarters, that CHS had reclassified patients as observation who had been billed as admitted for one-day stays.   These earlier statements establish that Defendants knew that their later statements designed to procure the proxies of Tenet's shareholders were materially false and/or misleading.  Just one example of such a statement is when Smith stated at

the January 11, 2011 investor conference:  "We've had 37 out of the last 41 quarters that we've had double-digit revenue growth […] over the last ten years we've had ten straight years of double-digit revenue growth, and in 90% of our quarters, we've improved our same store margins."

254.    Defendants also knew or reasonably should have known of the falsity of their statements that CHS has, over the past number of years, "Improve[d] Hospital Operations" through "Standardization and Centralization," including CHS's "Billing and Collections" and "Quality/Resource/Case Management" functions.  Defendants were well aware, or were reckless in not knowing, that the use of the Blue Book was pervasive at CHS, and that the Blue Book contained non-standard criteria biased toward admissions and away from observation.

255.    Defendants also knew or reasonably should have known the falsity of their very direct statements about the "synergies" achieved through CHS's acquisition of Triad because they were aware that a potentially material portion of those synergies were realized through improper admission practices.

256.    CHS management, including Defendants, also attended regular meetings with CHS executives and administrators of the various CHS hospitals at which one or more of the following topics were discussed:  whether the Blue Book and Pro-MED were being implemented "properly," whether ED conversion targets were being met, whether observation rates could be lowered, and whether CHS hospitals were staying under their respective Medicare and self-pay length-of-stay goals.

257.    On information and belief, during at least the 2006-2009 timeframe, moreover, Carolyn Lipp, a senior CHS executive who was responsible for overseeing the development, implementation and use of the Blue Book in CHS hospitals, also reported directly to Defendant

Smith, and in that capacity, attended regular meetings with Smith on the topic of the Blue Book. It is simply implausible, therefore, that Smith was unaware of the Blue Book and how it was being used at CHS hospitals to drive inappropriate admissions.

258.    Moreover, Defendants were on notice that their statements, including that the national trend toward increasing observation rate was not problematic for CHS, were materially false and/or misleading in light of the Texas Attorney General's investigation—the subpoena for which CHS received on November 15, 2010—into each of CHS's 18 Texas hospitals concerning "emergency department procedures and billing."  Given their awareness of both that investigation and the OIG's broader investigation into all of CHS hospitals by no later than April 8, 2011, Defendants knew or negligently disregarded the falsity of their statements on April 11, 2011 that Tenet's lawsuit raising the same issues into CHS's ED billing practices and procedures was "completely without merit" and "unfounded and irresponsible."

259.    Notwithstanding their knowledge of and/or negligence in disregarding the truth behind CHS's inflated financial performance, Defendants continued to make misrepresentations and omit any mention of the real reason for CHS's higher admission rates and in turn, higher revenues.  Thus, Defendants failed to disclose their improper admissions practices, manipulated admission rates, and the effect of that manipulation on CHS's financial performance, with a mental state of at least negligence.

## **DEMAND FOR A JURY TRIAL**

260.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

## COUNT I
### (Violation of 15 U.S.C. 78n(a) (Section 14(a) of the Securities and Exchange Act of 1934) and 17 C.F.R. § 240.14a-9)

261.    Tenet repeats and realleges each and every allegation set forth in paragraphs 1 to 260 as if fully set forth herein.

262.    This Count is brought against Defendants CHS, Smith, and Cash.

263.    CHS's proxy solicitation materials and statements made by Defendants Smith and Cash in connection with the solicitation of proxies are all subject to regulation under Section 14 of the Exchange Act.  Among other things, Section 14, also known as the Williams Act, regulates proxy solicitations.  Specifically, SEC Rule 14a-9 applies to Defendants' proxy solicitations and provides that "[n]o solicitation . . . shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

264.    As described above, the Defendants' proxy solicitations and statements related thereto contained numerous materially false and/or misleading statements and omissions of material facts in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

265.    The materially false and misleading misstatements and omissions in Defendants' proxy solicitations and statements related thereto were made with at least a negligent state of mind, as required under Section 14(a) of the Exchange Act and SEC Rule 14a-9.

266.    Tenet incurred significant costs on behalf of its shareholders in analyzing the fraudulent nature of Defendants' proxy solicitations and statements related thereto, so that shareholders could consider CHS's bid for Tenet and CHS's proposed slate of directors based upon materially accurate information.

**PLAINTIFF'S AMENDED COMPLAINT - Page 103**

267.    Accordingly, Tenet is entitled to an order awarding Tenet the costs and disbursements that it incurred in analyzing CHS's undisclosed conduct that made Defendants' proxy solicitations and statements related thereto false and/or misleading.

## COUNT II
### (Violation of 15 U.S.C. 78t(a) – Section 20(a) of the Securities and Exchange Act of 1934)

268.    Tenet repeats and realleges each and every allegation set forth in paragraphs 1 to 267 as if fully set forth herein.

269.    This Count is brought against Defendants Wayne T. Smith and W. Larry Cash.

270.    Messrs. Smith and Cash, by virtue of their positions as officers and directors of CHS, acted as controlling persons of Defendant CHS within the meaning of Section 20(a) of the Exchange Act.  Messrs. Smith and Cash had the power to control or influence, and did control and influence, the particular acts of CHS giving rise to the violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As controlling persons of CHS, Messrs. Smith and Cash are liable pursuant to Section 20(a) of the Exchange Act.

271.    Defendants Smith and Cash are jointly and severally liable under Section 20(a) of the Exchange Act to the same extent as Defendant CHS for the primary violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9, as set forth herein.

## REQUEST FOR RELIEF

WHEREFOR, Tenet prays for a judgment against Defendants as follows:

a)    awarding Tenet its costs and disbursements incurred in connection with analyzing Defendants' materially false and misleading proxy solicitations and statements, and economic harm related thereto;

      b)      awarding Tenet its costs and disbursements in this action, including reasonable attorneys' and experts' fees; and

      c)      granting Tenet such other and further relief as this Court may deem just and proper.

Dated: Dallas, Texas
      May 16, 2011

      GIBSON, DUNN & CRUTCHER LLP

      By: /s/ Robert C. Walters_____
          Robert C. Walters, TX Bar No. 20820300
          RWalters@gibsondunn.com
          Robert B. Krakow, TX Bar No. 11702000
          RKrakow@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Adam H. Offenhartz (admitted *pro hac vice*)
Brian M. Lutz (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Tel: (212) 351-3881
Fax (212) 351-4035

      2100 McKinney Avenue, Suite 1100
      Dallas, Texas 75201-6912
      Tel: (214) 698-3100
      Fax: (214) 571-2900

      *Attorneys for Plaintiff Tenet Healthcare Corporation*

**PLAINTIFF'S AMENDED COMPLAINT - Page 105**